No. 22-40516


IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

REID ETHERIDGE,
Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Texas

———————————

**BRIEF FOR APPELLANT**

———————————


MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

EVAN G. HOWZE
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002
Telephone: (713) 718-4600

**CERTIFICATE OF INTERESTED PERSONS**
United States v. Reid Etheridge,
No. 22-40516

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1.   District Judge: Hon. Randy Crane

2.   Magistrate Judge: Hon. J. Scott Hacker

3.   Appellant: Reid Etheridge

4.   Appellant's Former Counsel: Rudy Moreno, Esq., Osvaldo J. Morales, III, Esq., and Victoria Guerra, Esq.

5.   Appellant's Present Counsel: Federal Public Defender Marjorie A. Meyers and Assistant Federal Public Defender Evan G. Howze

6.   Appellee: United States of America

7.   Appellee's Counsel: United States Attorney Jennifer B. Lowery and Assistant United States Attorney Michael L. Mitchell

s/ *Evan G. Howze*
EVAN G. HOWZE

ii

## REQUEST FOR ORAL ARGUMENT

Mr. Etheridge requests oral argument. This appeal raises two issues. The first concerns whether the district court relied on a mistaken understanding of sentencing evidence it regarded as key to the decision to select a term of life imprisonment as opposed to a lesser term of years. Issue two challenges the district court's decision to order Mr. Etheridge to pay $22,000 in restitution in the absence of any competent evidence of recoverable losses incurred by the parents of the minor victims of his offenses. In counsel's view, oral discussion of the facts and relevant authorities would benefit the Court's resolution of these issues.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ..................................................................... ii

Request for Oral Argument ............................................................................. iii

Table of Citations ............................................................................................ vi

Statement of Jurisdiction ................................................................................. 1

Statement of the Issues .................................................................................... 2

Statement of the Case ...................................................................................... 3

Summary of the Argument .............................................................................. 21

Argument.......................................................................................................... 22

I.      The district court relied on a mistaken view of sentencing evidence that
        played a critical role in its decision to impose a life sentence, and that
        error warrants remand for resentencing under a correct understanding of
        the evidence.................................................................................................. 22

        A.    Standard of review ................................................................................ 23

        B.    The risk-assessment report prepared by the defense's expert factored
              heavily into the district court's decision to choose life over a term of
              years, and the court's statements suggest that it misinterpreted the ex-
              pert's conclusions in two material ways ................................................. 26

        C.    If the Court finds that the district court held a mistaken view of the
              expert's conclusions, then correction is warranted ............................... 32

              1.    A district court's reliance on an incorrect understanding
                    of relevant sentencing evidence is plain procedural and
                    substantive error............................................................................ 32

# TABLE OF CONTENTS – (cont'd)

**Page**

      2.    There is a reasonable probability that the errors affected the district court's decision to impose a life sentence, and leaving them uncorrected would undermine the fairness, integrity, and public reputation of judicial proceedings .................. 34

II.    The district court's respective $12,000 and $10,000 restitution awards lack sufficient evidentiary foundation and must be vacated............................ 39

    A.    Ordering restitution in the absence of evidence of recoverable losses is a plain error that necessarily warrants correction................................. 39

    B.    Statutory authority for restitution in this case ......................................... 41

    C.    The government did not produce evidence sufficient to justify any amount of restitution as to either victim.................................................... 43

    D.    The appropriate remedy is to vacate the restitution awards and render judgment of no restitution ............................................................ 48

Conclusion ...................................................................................................... 51

Certificate of Service ...................................................................................... 52

Certificate of Compliance............................................................................... 53

# TABLE OF CITATIONS

**Page(s)**

## CASES

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................... 22, 26, 33

*Holguin-Hernandez v. United States*, 140 S. Ct. 762 (2020) .............................. 24-26

*Kahler v. Kansas*, 140 S. Ct. 1021 (2020) .................................................. 34

*Molina-Martinez v. United States*, 578 U.S. 189 (2016) .................................... 24, 32

*Paroline v. United States*, 572 U.S. 434 (2014) ............................................ 42-44, 49

*Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018) ....................................... 38

*United States v. Archer*, 671 F.3d 149
  (2d Cir. 2011) ................................................................................ 49

*United States v. Arledge*, 553 F.3d 881
  (5th Cir. 2008) ......................................................................... 39-40, 48

*United States v. Austin*, 479 F.3d 363
  (5th Cir. 2007) ............................................................................ 40-41

*United States v. Bradley*, 628 F.3d 394
  (7th Cir. 2010) ................................................................................ 27

*United States v. Castillo*, 430 F.3d 230
  (5th Cir. 2005) ................................................................................ 22

*United States v. Chem. & Metal Indus., Inc.*,
  677 F.3d 750 (5th Cir. 2012) ........................................................... 39-40, 48

*United States v. Cooks*, 589 F.3d 173
  (5th Cir. 2009) ........................................................................ 22, 27, 33

*United States v. Corona-Gonzalez*, 628 F.3d 336
  (7th Cir. 2010) ................................................................................ 37

# CASES – (cont'd)

*United States v. Cruz-Pallares*, 396 F. App'x 170
(5th Cir. 2010) ................................................................... 33, 35

*United States v. Fields*, 777 F.3d 799
(5th Cir. 2015) ....................................................................... 32

*United States v. Foley*, 946 F.3d 681
(5th Cir. 2020) ................................................................... 27, 33

*United States v. Funke*, 846 F.3d 998
(8th Cir. 2017) ....................................................................... 43

*United States v. Gonzalez-Castillo*, 562 F.3d 80
(1st Cir. 2009) ................................................................... 35, 37

*United States v. Guidry*, 462 F.3d 373
(5th Cir. 2006) ....................................................................... 33

*United States v. Harris*, 702 F.3d 226
(5th Cir. 2012) ....................................................................... 23

*United States v. Hatley*, 717 F. App'x 457
(5th Cir. 2018) ................................................................... 33, 35

*United States v. Hernandez-Montes*, 831 F.3d 284
(5th Cir. 2016) ................................................................... 24, 26

*United States v. Inman*, 411 F.3d 591
(5th Cir. 2005) ....................................................................... 41

*United States v. Jimenez*, 692 F. App'x 192
(5th Cir. 2017) ............................................................... 41, 49-50

*United States v. Jimenez-Espinoza*, 408 F. App'x 823
(5th Cir. 2011) ....................................................................... 33

*United States v. Johnson*, 648 F.3d 273
(5th Cir. 2011) ....................................................................... 34

# CASES – (cont'd)

*United States v. Kempter*, 29 F.4th 960
   (8th Cir. 2022) ............................................................... 42

*United States v. Knowles*, 29 F.3d 947
   (5th Cir. 1994) ............................................................... 37

*United States v. Laney*, 189 F.3d 954
   (9th Cir. 1999) ............................................................... 43

*United States v. Maldonado*, 726 F. App'x 263
   (5th Cir. 2018) ............................................................... 33

*United States v. Maturin*, 488 F.3d 657
   (5th Cir. 2007) ............................................................... 40

*United States v. Olano*, 507 U.S. 725 (1993) ........................... 40

*United States v. Osman*, 853 F.3d 1184
   (11th Cir. 2017) ............................................................. 43

*United States v. Sanchez*, 277 F. App'x 494
   (5th Cir. 2008) ............................................................... 33

*United States v. Serrata*, 679 F. App'x 337
   (5th Cir. 2017) ............................................................... 43

*United States v. Sharma*, 703 F.3d 318
   (5th Cir. 2012) ........................................................... 40, 48

*United States v. Tobias*, 662 F.2d 381
   (5th Cir. Unit B Nov. 1981) ...................................... 26, 33

*United States v. Villalobos*, 879 F.3d 169
   (5th Cir. 2018) .................................................. 40, 43, 48-49

*United States v. Warfield*, 283 F. App'x 234
   (5th Cir. 2008) ............................................................... 33

# CASES – (cont'd)

*United States v. Wilson*, 614 F.3d 219
  (6th Cir. 2010) ................................................................... 35, 37

*United States v. Zarco-Beiza*, 24 F.4th 477
  (5th Cir. 2022) ...................................................... *passim*

# STATUTES AND RULES

18 U.S.C. § 2251 ................................................................. 41

18 U.S.C. § 2251(a) ......................................................... 4-5, 9

18 U.S.C. § 2251(e) ........................................................... 4-5

18 U.S.C. § 2252A(a)(2)(A) ................................................. 4

18 U.S.C. § 2252A(b)(1) ..................................................... 4

18 U.S.C. § 2259 ......................................................... 40-41, 43

18 U.S.C. § 2259(a) ..................................................... 9, 41-42

18 U.S.C. § 2259(b)(1) ................................................... 9, 42

18 U.S.C. § 2259(b)(2) ..................................................... 42

18 U.S.C. § 2259(b)(2)(A) ................................................. 42

18 U.S.C. § 2259(b)(2)(B) ................................................. 42

18 U.S.C. § 2259(b)(2)(C) ................................................. 42

18 U.S.C. § 2259(b)(3) ................................................ 9, 42, 49

18 U.S.C. § 2259(c)(2) ................................................... 42-43

18 U.S.C. § 2259(c)(3) ..................................................... 42

## STATUTES AND RULES – (cont'd)

18 U.S.C. § 2259(c)(4) ................................................ 9

18 U.S.C. § 2259(d) ................................................ 42

18 U.S.C. § 2422(b) ................................................ 4, 9, 41

18 U.S.C. § 2429 ................................................ 41, 43

18 U.S.C. § 2429(a) ................................................ 9, 41-42

18 U.S.C. § 2429(b)(1) ................................................ 9, 42

18 U.S.C. § 2429(b)(2) ................................................ 9, 42, 49

18 U.S.C. § 2429(b)(3) ................................................ 42

18 U.S.C. § 2429(d) ................................................ 9

18 U.S.C. § 3553(a) ................................................ *passim*

18 U.S.C. § 3663A ................................................ 42

18 U.S.C. § 3664 ................................................ 9, 42

18 U.S.C. § 3664(e) ................................................ 10, 49

18 U.S.C. § 3742 ................................................ 1

28 U.S.C. § 1291 ................................................ 1

Fed. R. App. P. 4(b)(1) ................................................ 1

5th Cir. R. 28.2.1 ................................................ ii

# SENTENCING GUIDELINES

USSG Ch. 5, Pt. A ........................................................................ 31

USSG Ch.5, Pt. A, comment. (n.2) ............................................... 5

USSG § 5G1.1(a) .......................................................................... 5

# MISELANEOUS

Amy Phenix & Yolanda Fernandez et al.,
  *Static-99R Coding Rules Revised – 2016* (2017),
  https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/sttc-2016/sttc-2016-en.pdf ........... 7

## STATEMENT OF JURISDICTION

The United States District Court for the Southern District of Texas entered judgment of conviction and sentence in this case on July 29, 2022. Mr. Etheridge timely filed notice of appeal on August 3, 2022. *See* Fed. R. App. P. 4(b)(1). This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

*Issue one*. Did the district court rely on a mistaken view of sentencing evidence that played a critical role in its decision to select a life sentence, and does that error warrant remand for resentencing in view of a correct understanding of the evidence?

*Issue two*. Do the district court's respective $12,000 and $10,000 restitution awards lack sufficient evidentiary foundation such that they must be vacated?

## STATEMENT OF THE CASE

### A.   The offenses and convictions

In October 2020, federal agents stationed in Texas's Rio Grande Valley learned that a Google account tied to Reid Etheridge's McAllen residence had uploaded materials believed to depict child pornography. ROA.230. Two cellular telephones and a memory card seized during a later search of the home were found to contain videos of Mr. Etheridge filming himself separately engaging in sexual activity with two female minors on multiple occasions. ROA.230-31.

Investigators identified the first minor victim (MV1, or K.C.) as the then-six-year-old daughter of Mr. Etheridge's former girlfriend (and co-defendant in this case), Alicia Cronkhite. ROA.356-59. Three videos featuring K.C. depict the minor masturbating Mr. Etheridge on two occasions. ROA.358-59 (¶¶ 24-26). Ms. Cronkhite is present, and verbally encouraging the sexual abuse, in the two videos documenting the second occasion. ROA.358-59 (¶¶ 25-26). Investigators also located text messages in which Mr. Etheridge solicited Ms. Cronkhite to take and send him pictures of K.C.'s exposed vagina. ROA.230-31, 355. Ms. Cronkhite acquiesced, and several of the responsive images were discovered on the seized devices mentioned above. ROA.230-31, 355, 357.

The second minor victim (MV2, or E.E.) was identified as Mr. Etheridge's then

four-year-old daughter. ROA.356-58. In a post-search interview, Mr. Etheridge admitted to engaging in, and filming, sexual conduct with his daughter on at least six occasions. ROA.355-56 (¶ 18). Two representative videos depict Mr. Etheridge vaginally penetrating E.E. with his penis on separate occasions. ROA.357-58 (¶¶ 22-23). All of the videos and images were produced (and, in the case of the images depicting K.C.'s genitals, sent) between January 1 and October 1, 2020. ROA.231.

These facts led federal authorities to arrest Mr. Etheridge and Ms. Cronkhite and charge them in a six-count indictment. ROA.39-42. Count one charged Mr. Etheridge and Ms. Cronkhite each with producing child pornography depicting K.C., 18 U.S.C. § 2251(a), (e). ROA.39. Counts two, three, and five respectively charged Mr. Etheridge with producing child pornography of E.E., using the internet to entice or persuade K.C. to engage in criminal sexual activity (i.e., the production of the pornographic images of her exposed vagina), 18 U.S.C. § 2422(b), and knowingly receiving child pornography, *id.* § 2252A(a)(2)(A), (b)(1). ROA.39-41. The remaining counts charged Ms. Cronkhite with aiding and abetting Mr. Etheridge's enticement offense (count four) and knowingly distributing the child pornography Mr. Etheridge was charged with receiving (count six). ROA.40-41.

Mr. Etheridge pleaded guilty to both production counts (one and two) and the enticement count (three) pursuant to a plea agreement. ROA.221-23, 324-26. The

agreement called for Mr. Etheridge to plead to the first three counts, waive any property interest in the seized devices, comply with the Sex Offender Registration and Notification Act, and "pay restitution as determined by the Court." ROA.227, 324. In exchange, the government promised to dismiss the receiving count (five) and recommend full credit for acceptance of responsibility at sentencing. ROA.227-28, 324. The agreement did not require Mr. Etheridge to waive his appellate rights.[1]

## B.   Presentencing investigation and proceedings

*The continuance for expert psychosexual evaluation*. Due to the nature of Mr. Etheridge's and Ms. Cronkhite's offenses, the presentence reports in their respective cases calculated recommended Sentencing Guidelines ranges of life imprisonment as to the most serious count—the enticement count.[2] ROA.236-37, 241; *see* ROA.360-64, 366 (¶¶ 34-59, 77-79). Given the gravity of the potential life sentences, the defendants moved to continue sentencing for the purpose of securing an expert psychosexual evaluation of the degree of recidivism risk each would present if released in the future. ROA.83-84, 237-40.

---

[1] Ms. Cronkhite pleaded guilty, under the same terms, to the shared production count (one) and the aiding-and-abetting-enticement count (four) unique to her. *See* Judgment, *United States v. Alicia Cronkhite*, 7:20-cr-1791-2 (S.D. Tex. July 29, 2022), Docket Entry 122; *see also* Plea Agreement, *United States v. Alicia Cronkhite*, 7:20-cr-1791-2 (S.D. Tex. Dec. 9, 2021), Docket Entry 83.

[2] This range fell at the intersection of a total offense level of 43 (reduced from 50 per operation of USSG Ch.5, Pt. A, comment. (n.2)) and a criminal history category of I. *See* ROA.282-83,362-64. Although covered by the same calculation, the Guidelines ranges for Mr. Etheridge's production counts (one and two) were constrained by the 30-year statutory maximum prison term available for Section 2251(a) offenses, *see* 18 U.S.C. § 2251(e), and so settled at a flat 360 months. ROA.366 (¶¶ 74-75); *see* USSG § 5G1.1(a).

At the first of several hearings related to the motion, the district court expressed concern over the "highly unusual" circumstance that Mr. Etheridge and Ms. Cronkhite had pleaded guilty to offenses carrying life-sentence recommendations, as well as a corresponding desire to "look at [the cases] more closely" and "make sure [defense counsel] were doing everything that [they] could do to benefit [their] clients." ROA. 237, 241. After noting the "not uncommon" nature of psychosexual evaluations in child pornography cases and acknowledging their utility to the inquiry into the defendant's "background" and "likelihood of recidivism," ROA.238-39, the court stressed that "[t]hese [were] very serious cases" that "need a lot of attention" to get "ready for sentencing" and granted the motions. ROA.243. Due to Mr. Etheridge's inability to afford expert assistance, the court ultimately granted his request to appoint and allocate funds for clinical psychologist Stephen Thorne, Ph.D., to perform the contemplated psychosexual evaluation. ROA.400-03, 429, 436, 452-57, 460-61.

***The expert's report***. Dr. Thorne drafted a report aimed at providing the district court "information relating to [Mr. Etheridge's] level of risk for engaging in sexually deviant/violent behavior in the future." ROA.460; *see generally* ROA.469-82. In the report, Dr. Thorne explained that he employed two common risk-assessment instruments—the "Risk for Sexual Violence Protocol" (or RSVP); and the "Static-99R"— to evaluate Mr. Etheridge's potential likelihood of reoffending in the future. ROA.477-78.

Dr. Thorne opined that the RSVP guidelines "suggest[ed] Mr. Etheridge is a 'moderate' risk for future sexual recidivism" (ROA.477), while Mr. Etheridge's score on the Static-99R ("+1") placed him in "the 'Average' risk category for being convicted of another sex offense." ROA.478. With respect to the Static-99R evaluation, Dr. Thorne's report advised that Mr. Etheridge's current score ("+1" overall) and consequent "average" risk designation were "based on the assumption that he could be released into the community prior to his 60th birthday." ROA.478. This assumption produced a score of "–1" on "the 'Age at release from index sex offense' item" on the Static-99R, which, in combination with scores of "+1" and "+1" on the only two other items not scored at zero, resulted in the overall score of "+1." ROA.478. The report flagged, however, that Mr. Etheridge's "overall Static-99R score would be revised" were he released "on, or after, his 60th birthday." ROA.478.[3]

Dr. Thorne's report also explained that available data indicates that offenders with a "+1" overall Static-99R score "have a sexual recidivism rate approximately [three-quarters] of that of those offenders that have been described as the 'typical'

---

[3] The equation would change if Mr. Etheridge—who was almost 43 at the time of sentencing (ROA.352) and subject to a statutory minimum prison term of 15 years and Guidelines ranges of life and 360 months (30 years) (ROA.366)—was instead scored on the assumption that he would be released beyond his 60th birthday. Under that assumption, Mr. Etheridge's score on the age-at-release metric would be "–3," thereby adjusting his overall Static-99R score to "–1," as opposed to "+1." *See* Amy Phenix & Yolanda Fernandez et al., *Static-99R Coding Rules Revised – 2016*, at 51 (2017), accessible online at https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/sttc-2016/sttc-2016-en.pdf. The Static-99R classifies individuals with overall scores of "–1" or "0" as presenting a "below average risk" of reoffending. *See id.* at 16, 99.

offender (those offenders in the middle of the risk distribution)." ROA.478. The report further advised that individuals in the "average" risk category generally have "5-year predicted recidivism estimates" of "between 2.7% and 3.7%" and "10-year predicted" estimates of between "3.9% and 6.7%." ROA.478. "The reader should also note," the report cautioned, "that the authors of the Static-99R have recommended that, when available, clinicians should use 'local norms' when assigning percentages (relating to risk) to a score." ROA.478. Dr. Thorne accordingly reported that the available data for individuals "in Texas" with Mr. Etheridge's "+1" score reflected a five-year predicted recidivism rate of "between 1.4% and 2.6%" (ROA.478-79), and that, over a period of either five years or ten years, "less than 3% of [Texas] offenders with this same score were determined to have committed new sex offenses." ROA.481. Dr. Thorne made a point to stress that "the large majority of sex offenders with Mr. Etheridge's current 'Average' Static-99R score do <u>not</u> have documented arrests/convictions for new sex offenses." ROA.481 (original emphasis). And he advised that this trend "holds true when considering national and international samples of sex offenders, but even more so when considering" a sample of Texas offenders. ROA.481.

On a more general level, the report also urged the reader to "note that it is generally accepted by researchers and clinicians that the large majority of adult sex offenders do <u>not</u> re-offend sexually," and that "first-time sex offenders have been found to have significantly lower levels of sexual recidivism than do those with previous

convictions for sex offenses." ROA.479 (original emphasis). As context, the report invoked one study that found sex offenders with prior sex-offense convictions to have "nearly double the recidivism rates of first-time sexual offenders." ROA.479. Finally, the report highlighted the "current consensus in the relevant literature" that there is a correlation between successful completion of sex offender treatment programs and the likelihood of sexual recidivism. ROA.482. Dr. Thorne thus stressed that ensuring that Mr. Etheridge participates in and completes a comprehensive treatment program was "of particular importance" because, in the doctor's opinion, "appropriate/effective therapeutic intervention" would "likely" reduce Mr. Etheridge's risk of reoffending, whereas failure to complete such a program would have the opposite effect. ROA.482.

***The absence of presentence evidence of restitution***. Because Mr. Etheridge pleaded guilty to violating Sections 2251(a) and 2422(b), he also faced a statutory obligation to pay restitution for any recoverable losses incurred by the victims of his offenses—to include the respective minors' "legal guardian[s]"—as a proximate result of those offenses. *See* 18 U.S.C. §§ 2259(a), (b)(1), (c)(4), and 2429(a), (b)(1), (d). And, as noted above, Mr. Etheridge pledged in his plea agreement to pay restitution consistent that statutory obligation. ROA.227, 324. Each applicable statute directs that "[a]n order of restitution under this section shall be issued and enforced in accordance with section 3664" of Title 18. 18 U.S.C. §§ 2259(b)(3) and 2429(b)(2). Section 3664, in turn, provides in relevant part that "[t]he burden of demonstrating the amount of

the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." *Id.* § 3664(e).

The presentence report addressed restitution in two places: in a section discussing the "victim impact" of the offenses and in a section devoted to "restitution." In the "victim impact" section, the report related that the government had "identified K.C. and E.E. as victims in this case." ROA.360. The report further noted that, "On May 3, 2021, the U.S. Probation Office mailed a *Declaration of Victim Losses Affidavit* to the guardians of said victims requesting restitution information and [that] a response remain[ed] pending" as of the filing of the final revised report (June 4, 2021). ROA.360. The "restitution" section simply repeated the same information. ROA.369.

In an addendum to the report, the probation officer advised that E.E.'s mother, Raquel Trevino (*see* ROA.364 (¶ 65)), had returned the victim impact form. ROA.378. In the attached form, signed "under penalty of law," Ms. Trevino stated that she and E.E. had attended and subsequently "completed" counseling provided by the "Children's Advocacy Center," indicated "No" in the "Counseling expenses" field, and answered the "Future counseling sessions anticipated" field, "None for now." ROA.379-80. Ms. Trevino also answered "Yes" to the field asking if she had "Lost Income/Wages," but she left the corresponding field labeled "Amount of lost income" blank. ROA.379. And while Ms. Trevino indicated "Yes" in the "Medical expenses" field, she did not describe any injuries or procedures E.E. had endured; she also wrote,

"These were minimal," when asked to state the "Amount of medical expenses not covered by insurance." ROA.380. K.C.'s father, Ryan Cronkhite, never returned an affidavit.

The trial prosecutor's pleadings likewise marshalled no evidence of losses incurred or likely to be incurred in the future by the minors or their parents—such as doctor or therapy bills, travel expenses, lost wages, or proof that the images and videos of the abuse were circulated and still accessible on the Internet. *See* ROA.492-98. In fact, as relevant to potential future losses, the prosecutor advised that "the Government d[id] not believe, nor ha[d] any evidence that the videos of the [m]inor victims ha[d] been shared to the internet or other sexual predators." ROA.496.

### C.  Sentencing

#### 1.  The choice between life in prison and a term of years

Mr. Etheridge appeared for sentencing on July 21, 2022. ROA.271. All agreed that the applicable Guidelines range settled at life imprisonment for the most serious, enticement count. ROA.282-83. The question with regard to prison term, therefore, was whether the district court would exercise its discretion to vary below the recommended range and impose some term of years. ROA.283. As to that choice, the parties and the court focused the bulk of their energy on the likelihood, as informed by the risk-assessment conclusions set out in Dr. Thorne's report, that Mr. Etheridge might reoffend if released. *See* ROA.283-93.

***The district court's view of the expert report***. At the start of the hearing, defense counsel informed the district court that Dr. Thorne was on standby and available to testify by video if the court "ha[d] more questions" or "needed additional information" outside the report, but that the defense did not plan to call on the doctor otherwise. ROA.275. In response, the district court articulated the following understanding of Dr. Thorne's risk-of-recidivism evaluation:

> I mean he [Dr. Thorne] . . . I mean, his conclusion was disturbing, given the underlying events, in that, he thought – I believe, and I'll pull his report here – but *basically, he said Mr. Etheridge has an average chance of reoffending*. I don't know. *An average chance seems to me more than a slight chance*. And *I found that significant* that it wasn't like Ms. Cronkhite's report. Those were very different.
>
> So I mean, let's go through [the hearing]; and if we feel like we need to clarify something, then, we can get him [Dr. Thorne] on the line.

ROA.275-76 (emphasis added).

After some housekeeping, including review of a sentencing memorandum and attached materials filed that morning (ROA.276-82, 499-514), the court invited the defense to speak for Mr. Etheridge and make his case for a "variance." ROA.283. The ensuing mitigating presentation highlighted several points from the recently-filed submissions (including evidence supporting Mr. Etheridge's claim to have been sexually abused as a child and his history of stable work employment); stressed that this was Mr. Etheridge's first offense of any kind, that there was no evidence of abuse apart from K.C. and E.E., and the relatively lower rate of recidivism among first-time sex

offenders; urged the court to recommend a prison with sex-offender treatment pro-gramming; and noted that a first-time offense for similar conduct under Texas law carries a minimum term of 25 years. ROA.283-93. Defense counsel submitted that "something like a 20- to 30-year sentence would be sufficient to address" the court's concerns over "protection of the public and protection of the victims" and to allow Mr. Etheridge "to get some help." ROA.293.

As counsel spoke, the district court interjected several times to emphasize the primacy of its concern for public protection and the importance of its understanding of Dr. Thorne's report to that concern. *See* ROA.287-91. For instance, contrasting Mr. Etheridge's case with a "child porn case" in which the psychologist's report indicates the defendant has an unhealthy fascination with "observing the children in sexual acts" but is "'not likely' to act out,'" the court explained:

> And again, Mr. Etheridge, a completely different individual. He is someone who is a pedophile engaged in incestuous behavior, violent, re-peatedly, multiple victims, again, over, I think, a significant period of time. We're all left to wonder if they were there were [*sic*] other victims that were antecedent to the discovery of these events, and *so I took a lot of interest in this evaluation of him*. What's the expert going to say?

> And *I just put a lot of weight in that* in deciding, well, what's – how do we protect future – potential future victims from someone such as Mr. Etheridge? . . . .

* * *

It's [i.e., how Mr. Etheridge got 'to the point of engaging in these horrible acts'] hard to fathom, and really, there is – the psychiatrist or psychologist doesn't really explain that, other than just to say, this is where he is, and then, does some evaluation, does some diagnostic testing and statistics are provided, and he ultimately says, "Look, I can't guarantee you that he's not going to do this again. *In fact, I'd say he has an average chance of reoffending.*"

*That's very concerning to the Court.* I mean, this is just a horrible, horrible crime, and I am – you [defense counsel] used the words "swept up." I'm not swept up. The facts in this case are just so horrible, it is – *you are very concerned* about protecting other children.

\* \* \*

And again, it appeared to the Court, that unchecked, he would have gone onto somebody else; and as you [defense counsel] mentioned, untreated. If this mental disease that he suffers from, I mean, I have no doubt that there would have been future victims, and I worry that there were past victims also that haven't made a cry out. *So again, I just put a lot of weight in what the psychologist says, and I'm just worried about that.*

ROA.287-89 (emphasis added). After a brief interlude from counsel, the court again

stressed the relevance of the report to its public-protection concerns:

No. So obviously, one of the sentencing factors is to protect the public. And so I looked at the evaluation that was done where, I believe, a large part of the evaluation was, is he somebody that is going to harm people in the future? Does – is this deviant sexual behavior something that is going to reappear? *And so the psychologist, in focusing on that, says, "I think, there is an average chance that that will happen," is how I read the report.* Again, I'm – . . . the door is open for you [defense counsel], though, to disagree or to suggest that [the report] says something otherwise or point it out to me.

ROA.289-90 (emphasis added).

14

In response, defense counsel agreed that Dr. Thorne's report "does say that" but noted that the report also said "that all of this is based on an assumption" and that "a large majority of adult sex offenders do not reoffend sexually." ROA.290.

*The life sentence.* After hearing allocution from Mr. Etheridge and the victims' parents (discussed further below), *see* ROA.294-312, and from the government, *see* ROA.312-15, the district court proceeded to pronounce sentence. *See* ROA.317-19. As a preface, the court explained:

> I have reset the sentencing hearing multiple times because I wanted to leave no Thorne unturned given how serious this was, but I'm still convinced that the sentence I'm going to pronounce is the fair one. It's what I had arrived at when I – in preparing for today, but [I] was open-minded to anything that might occur here before making an ultimate decision.

ROA.317-18. The court then explained that close consideration of "all the 3553(a) factors" led it conclude that "the guideline sentence is a fair one here largely because of [its] concern and fear that Mr. Etheridge is going to reoffend." ROA.318. The court accordingly committed Mr. Etheridge to custody "for a term of life."[4] ROA.319.

---

[4] The life sentence applied only to the enticement count (three). ROA.167, 321. On each production count (one and two), the district court imposed concurrent, statutory-maximum terms of 360 months and then ordered those terms to run concurrently with the life term on count three. ROA.167, 321. The court further imposed, "in the event Mr. Etheridge [were to be] released," concurrent terms of lifetime supervised release on all three counts. ROA.168, 319.

## 2. The restitution awards

Consistent with its approach to that point, the government made no effort to produce evidence of restitutionary losses at sentencing. The prosecutor did, however, reaffirm that the government had no evidence to suggest that any of the videos or images of abuse involved in the three counts of conviction had been "shared with anybody else." ROA.315.

As noted, the district court heard "victim allocution" from two parents: Mr. Cronkhite (K.C.'s father and Ms. Cronkhite's spouse); and Ms. Trevino (E.E.'s mother and Mr. Etheridge's former spouse). ROA.296, 307, 364. The court explained that, as victims, Mr. Cronkhite and Ms. Trevino had the right to speak about how the offenses impacted them, but noted that the "allocution[s]" were "not under oath" and, therefore, "nobody [could] ask them questions" apart from the court.[5] ROA.296. Despite the lack of evidence of losses disclosed prior to the hearing, the district court raised the topic of restitution during each parent's allocution. *See* ROA.304, 307-08.

As relevant to the court's inquiry into restitution, the following colloquy occurred during Mr. Cronkhite's allocution:

---

[5] The court noted that "[i]f there is some kind of testimony you want to provide, then, I can swear you in[.]" ROA.296. But neither victim elected, or was asked, to provide testimony.

The Court:     [O]ne of the things the Court also has to order, if requested, is restitution. In many similar cases such as this, the victims will write to the Court explaining that they're going to need psychiatric care for the next decade or longer or for life at a certain rate, and the Court can order that the perpetrator pay restitution to the victim to compensate for those expenses now that the victim is going to have to incur because of the crime.

Is there any request you want to make on that, or do you have an estimate of what that might be, or do you believe any is going to be needed?

Mr. Cronkhite:     I do plan on making sure that she has more counseling in the future, *but I don't have any such request at this time. I wasn't aware that that was an option.*

The Court:     Right. So somebody is going to have pay for, I mean, let's suppose she's . . . in the teenage years, or you know, I'm just speculating as to when you might have some emotional issues manifest; but for the sake of discussion, let's suppose, during the teenage years, the victim starts to remember more, maybe there are some events that trigger her memory more and will need, I mean, have you considered they'll need – this victim will need more intense therapy during those years, or some event causes her to remember this in a traumatic way?

And have you discussed that with her current psychologist?

Mr. Cronkhite:     *I have not, no.* I'm actually looking for a different one. I haven't been particularly satisfied with this one.

The Court:     Okay, How is that currently paid for? Through some kind of insurance or –

| | |
|---|---|
| Mr. Cronkhite: | I'm paying for it directly. |
| The Court: | Okay. Okay. Well, you can be reimbursed for expenses you've incurred so far for therapy. What would you estimate that the cost to date has been for her therapy and assessments? |
| Mr. Cronkhite: | *I'm honestly not sure.* Is this some information I could provide another time or — |
| The Court: | Well, this is the final hearing where Mr. Etheridge and Ms. Cronkhite are going to be sentenced, but it doesn't have to be mathematically precise. You can provide an estimate of – to the best of your ability – of what is has been. |
| Mr. Cronkhite: | *Honestly, I'd prefer not to.* |
| The Court: | Okay. All right. Well, then, I'm not going to have any figure to order for restitution. |
| Mr. Cronkhite: | *Oh, I totally understand.* |
| The Court: | Okay. Mr. Etheridge has quite a bit of money that's available for that that otherwise will be assessed as a fine; and it, therefore, wouldn't go to benefit the victims unless you have some sort of testimony you can offer on that. . . . |
| Mr. Cronkhite: | I'm sorry. |

ROA.302-05 (emphasis added).

Although acknowledging Mr. Cronkhite's "reluctan[ce]," the district court continued to press the issue, admonishing that this was Mr. Cronkhite's "chance to help the victim" and that Mr. Etheridge had "quite a bit of money" in a "teacher retirement

18

account." ROA.304-05. Mr. Cronkhite relented, leading to following colloquy:

| | |
|---|---|
| Mr. Cronkhite: | I would estimate approximately $2,000. |
| The Court: | To date? |
| Mr. Cronkhite: | Yes. |
| The Court: | All right. And so it's been two years. Would you estimate probably similar expense over the next – every two years, maybe? I mean, it's about a rate about a thousand dollars a year. Would you estimate that's probably reasonable for the next five or six years at least? |
| Mr. Cronkhite: | Yes. Yes, Your Honor. That would be reasonable. |
| The Court: | Okay. All right. I will consider that. |

ROA.305-06.

Ms. Trevino's allocution was also unsworn. *See* ROA.307. The following two colloquies related to restitution:

| | |
|---|---|
| The Court: | [H]ave you incurred any expenses for therapy, and do you expect to incur future therapy – |
| Ms. Trevino: | *[It] was all free. I didn't . . . pay for anything*, but my fear is that *there may be* expenses in the future, and I'm hoping that's not the case . . . *but I just don't know*. |
| | * * * |
| The Court: | Based on some of the descriptions of what was in some of these videos, it appears as though she [E.E.] may have been physically injured. Has she had to have any medical care for any physical injuries? |

| | |
|---|---|
| Ms. Trevino: | *No*. They did an exam . . . after, and they did not think there were any injuries. |
| The Court: | Okay. So we've talked a little bit about therapy expenses that you're going to incur. Are there any other expenses that you think the victim is going to incur as a consequence of trying to get over this event or address this event – these events? |
| Ms. Trevino: | *No, sir*. My only concern is future therapy. |

ROA.309-10, 311-12 (emphasis added; immaterial interruptions omitted).

The district court later pronounced restitution awards for each minor as follows:

So to Victim 1 [K.C.], who had somebody speak on her behalf first, I'm going to order past restitution in the amount of $2,000, and then, future restitution in the amount of $10,000 for a total of $12,000 in restitution payable on behalf of [K.C.], and I'm going to require that be paid immediately upon release from imprisonment unless the Government can obtain those assets prior to that time. I'm not sure how that works since he has a life sentence. Normally, it's a term of supervision that you have to pay back restitution, but I'm going to order it paid immediately.

And then, on, I believe, that Victim 2 [E.E.] is going to need similar care based on [Mr. Cronkhite's] testimony on behalf of Victim 1 [K.C.]. So I'm going to treat these victims consistently, and therefore, require, order $10,000 of future therapy needs as restitution to [E.E.], again, also payable immediately on behalf of [E.E.].

ROA.319-20.

Mr. Etheridge timely appealed. ROA.173-74.

## SUMMARY OF THE ARGUMENT

***Issue One***: The district court read the evidence that mattered most to its decision to impose a life sentence, Dr. Thorne's report, as giving Mr. Etheridge an "average chance"—effectively, 50/50—to engage in sexual abuse again were he ever released. But in fact, Dr. Thorne reported that the chance of Mr. Etheridge reoffending was far lower, resting somewhere between one and a half and just under seven percent. And, in fact, the report made clear that even this extremely low probability assumed a release prior to age 60; if Mr. Etheridge were released after turning 60—as was certain to be the case under any term of years the court might realistically have imposed—his chances of repeat offending would be lower still.

Because the district court held a clearly erroneous view of the evidence that it gave the most weight in choosing life imprisonment over a lesser term of years, its sentencing decision is both procedurally and substantively flawed. The appropriate course is to vacate Mr. Etheridge's life sentence and remand for the district court to reconsider its sentencing decision with a correct understanding of the evidence.

***Issue Two***: The district court's $12,000 and $10,000 restitution orders must be vacated. The government produced no evidence of recoverable losses. And the victim-parents' allocution statements provided no factual footing for the awarded sums. Because no special circumstances justify the government's total failure to marshal any evidence of loss, the Court should render a judgment of no restitution.

# ARGUMENT

**I.**  **The district court relied on a mistaken view of sentencing evidence that played a critical role in its decision to impose a life sentence, and that error warrants remand for resentencing under a correct understanding of the evidence.**

Federal prison sentences are reviewed for "reasonableness" under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007). That review proceeds in two parts. *Id.* at 51. First, the court of appeals must "ensure that the district court committed no significant procedural error." *Id.* If no procedural error exists, the appellate court evaluates the sentence's substantive reasonableness, "tak[ing] into account the totality of the circumstances." *Id.* A procedural error occurs if the district court bases its sentencing decision in part on a clearly erroneous assessment of the evidence. *See United States v. Castillo*, 430 F.3d 230, 238-39, 243-44 (5th Cir. 2005); *Gall*, 552 U.S. at 51. And, as relevant here, a sentence is unreasonable in substance either if the court "g[ave] significant weight to an irrelevant or improper factor" when fashioning it, or if the sentence "represents a clear error of judgment in balancing" the 18 U.S.C. § 3553(a) sentencing factors as a whole. *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009).

The district court ran afoul of both of these rules in sentencing Mr. Etheridge to life in prison. The district court repeatedly stressed that Dr. Thorne's evaluation of the likelihood that Mr. Etheridge might reoffend in the future represented the primary

factor motivating its decision to impose a life sentence instead of a substantial term of years. But the court misread the report in two material ways. It believed there was an an "average chance" Mr. Etheridge would reoffend, when in fact the doctor reported a likelihood in the single digits. And the court understood this degree of risk to apply whenever Mr. Etheridge might be released in the future, when in fact the report advised that it was contingent on the assumption that Mr. Etheridge would be released prior to age 60—i.e., that he would serve less than 17 years.

The upshot: the district court's sentencing decision was informed by a clearly erroneous understanding of the evidence the court deemed critical to its view of the Section 3553(a) factor that concerned it most. And that erroneous understanding necessarily skewed the relative weight the court attached to the rest of the relevant factors. Especially in light of the gravity of the choice before the district court—life (and thus, death) in prison, or a substantial term of years and release, if ever, at severely advanced age—the appropriate course is to remand for the court to reconsider those options in light of a correct view of the evidence.

## A.   Standard of review

Preserved claims of procedural sentencing error—including "selecting a sentence based on erroneous factors"—are reviewed de novo. *United States v. Harris*, 702 F.3d 226, 229 (5th Cir. 2012). Review of "a properly preserved claim of substantive unreasonableness [is] for abuse of discretion." *United States v. Zarco-Beiza*, 24

F.4th 477, 480 (5th Cir. 2022). In the absence of a specific objection, review of both procedural and substantive sentencing challenges occurs through the lens of plain error. Plain-error review has four prongs. "First, there must be an error that has not been intentionally relinquished or abandoned." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). "Second, the error must be plain—that is to say, clear or obvious." *Id.* "Third, the error must have affected the defendant's substantial rights, which in the ordinary case means he or she must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* (cleaned up). "Once these three conditions have been met, the court of appeals should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned up).

Mr. Etheridge contends that he preserved the procedural and substantive errors raised here. "To preserve [an] issue for appeal, 'the basis for objection presented below [must give] the district court the opportunity to address the gravamen of the argument presented on appeal.'" *United States v. Hernandez-Montes*, 831 F.3d 284, 290 (5th Cir. 2016) (citation omitted). "A defendant who, by advocating for a particular sentence, communicates to the trial judge his view that a longer sentence is 'greater than necessary' has thereby informed the court of the legal error at issue in an appellate challenge to the substantive reasonableness of the sentence." *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766-67 (2020). In this Circuit, the defendant's advocacy

for a lower term must also fairly alert the district court to the essence of the substantive-reasonableness grounds pressed on appeal. *See Zarco-Beiza*, 24 F.th at 481-82. In *Zarco-Beiza*, for example, the defendant's mere observation that he was presumed innocent of prior unadjudicated charges was insufficient to apprise the trial court of his later claim on appeal that the record information on those charges was so unreliable as to qualify as a "bare-arrest record." *See id.* at 482 & n.4.

Here, trial counsel argued at sentencing that "a 20- to 30-year sentence would be sufficient to address" the district court's concerns over "protection of the public and protection of the victims" (ROA.293), and thus clearly "communicate[d]" Mr. Etheridge's "view that a [life] sentence [would be] 'greater than necessary.'" *Holguin-Hernandez*, 140 S. Ct. at 766. In the course of doing so, moreover, trial counsel responded to the court's entreaty to "disagree [with its reading of the report] or to suggest that [the report] says something else" by noting that the doctor's conclusions were all "based on an assumption" and by observing that the report also advised that the "large majority of adult sex offenders do not reoffend sexually." ROA.290.

To be sure, trial counsel did not explicitly identify the pertinent "assumption" (i.e., that Mr. Etheridge would be released before he turned 60), and she did not dispute the district court's characterization of the degree of reported recidivism risk as an "average chance." Nevertheless, trial counsel's response, when considered in tandem with her advocacy for a nonlife term, notified the court of Mr. Etheridge's contention

25

that the court's view of Dr. Thorne's risk evaluation (1) was inaccurate, and so proce-durally flawed, and (2) would lead to a sentence that is greater than necessary to ade-quately account for the court's public-protection concerns. In this way, counsel "brought ['the claimed error'] to the court's attention," *Zarco-Beiza*, 24 F.4th at 481 (quoting *Holguin-Hernandez*, 140 S. Ct. at 766), and afforded the court sufficient op-portunity to "address the gravamen of the argument[s]" raised in this appeal. *Hernan-dez-Montes*, 831 F.3d at 290.

In any event, Mr. Etheridge is prepared to, and does, address both his procedural and substantive claims as if subject to plain-error review. Even under that heightened standard, the trial court's reliance on an incorrect understanding of the evidence it deemed most vital to the sentencing calculus is an error that warrants correction.

**B.    The risk-assessment report prepared by the defense's expert factored heavily into the district court's decision to choose life over a term of years, and the court's statements suggest that it misinterpreted the expert's conclusions in two material ways.**

"[S]elect[ing] a sentence based on clearly erroneous facts" is a "significant pro-cedural error." *Gall*, 552 U.S. at 51. Indeed, this Court has long held that "[s]entences based upon erroneous and material information or assumptions violate due process." *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. Unit B Nov. 1981).

A court's reliance on an unsubstantiated view of the sentencing evidence—such as an erroneous belief that the mere fact of a defendant's prior arrest on unadjudicated

charges proves his guilt of the charged offense—likewise renders a sentence substantively unreasonable. *See, e.g.*, *Zarco-Beiza*, 24 F.4th at 480-81, 481 n.2; *United States v. Foley*, 946 F.3d 681, 685 (5th Cir. 2020). After all, to say that a court's consideration of an unproven or incorrect fact at sentencing violates due process is to recognize that, in considering that fact, the court has given "significant weight" to an "improper factor." *Cooks*, 589 F.3d at 186. At the same time, where the weight assigned a relevant factor rests on a mistaken or unproven factual assumption, the court's "skewed view" of that factor "necessarily color[s] the court's view of the remaining § 3553(a) factors." *United States v. Bradley*, 628 F.3d 394, 401 (7th Cir. 2010).

In this case, the district court imposed a life sentence based on a clearly erroneous understanding of Dr. Thorne's psychosexual-evaluation report. As an initial matter, there is no doubt that the district court's interpretation of the report weighed heavily on its sentencing decision. The court made clear that it was seriously considering Mr. Etheridge's plea for mercy—that is, his request that the court vary below the life prison term recommended by the Guidelines. Indeed, just before pronouncing sentence, the court expressly noted that it came into sentencing leaning toward a life sentence but remained "open-minded to anything that might occur [during the hearing] before making [its] ultimate decision." ROA.318. The court also made plain that the primary motivating factor behind its decision to impose the life term was its "concern and fear that Mr. Etheridge is going to reoffend" if ever released in the future.

27

ROA.318. And the court similarly left no room to doubt that this concern hinged on its understanding of Dr. Thorne's reported risk-assessment findings, repeatedly stressing that it understood the psychologist's report to say that Mr. Etheridge had "an average chance of reoffending," ROA.276; *see* ROA.289 (same); ROA.290 (similar), and that it "put a lot of weight" on Dr. Thorne's "evaluation of" Mr. Etheridge "in deciding" the extent to which a need to "protect future – potential future victims" existed. ROA.288; *see* ROA.289 (reiterating, "So again, I just put a lot of weight in what the psychologist says, and I'm just worried about that"). The district court's statements, however, reveal that it misunderstood the doctor's findings in two material ways.

First, the district court erroneously interpreted Dr. Thorne's conclusion that Mr. Etheridge fell in the "average" category on the Static-99R risk-assessment tool as indicating that there was an "average chance" that he would reoffend if released. Three times during the hearing, the court explained that, on the question whether "this deviant sexual behavior [is] something that is going to reappear," it understood Dr. Thorne's report to "say[]" that "'there is an average chance that that will happen.'" ROA.290.[6] As is apparent from these statements, the court read the report to "say"

---

[6] *See* ROA.276 (describing Dr. Thorne's "conclusion" as, "basically, he said Mr. Etheridge has an average chance of reoffending"); ROA.289 (describing what Dr. Thorne "ultimately says" as, "'Look, I can't guarantee you that [Mr. Etheridge is] not going to do this again. In fact, I'd say he has an average chance of reoffending'").

that the likelihood that Mr. Etheridge will reoffend if released is about midway be-
tween the extremes of nil and guaranteed (colloquially, "50/50"), or was at least not
out of the ordinary.

That is not what the report says. Dr. Thorne was clear as to what an individual's
placement in the Static-99R's "average" risk category implies as to the statistical like-
lihood, or chance, that the individual will engage in sexual misconduct again: gener-
ally speaking, such an individual has *at most* a 3.7 percent chance of reoffending in-
side five years of release and a 6.7 percent chance of reoffending within 10 years; but
where the individual is in Texas, as Mr. Etheridge is, the chances are below three per-
cent. ROA.478-79, 481. On the related topic of known "recidivism rates," the report
advises that individuals in the Static-99R "average" category have lower rates than
"the 'typical' offender (those offenders in the middle of the risk distribution)," and
that the "large majority" of those in the "average" category "do <u>not</u> have documented
arrests/convictions for new sex offenses." ROA.481 (original emphasis).

In other words, the chance that Mr. Etheridge would reoffend if released, as
reported by Dr. Thorne, is nothing close to "average"—it is, in fact, extremely low.
The district court erroneously believed that Dr. Thorne assigned Mr. Etheridge a sig-
nificantly greater likelihood of reoffending than the report in fact reflects.

The district court's second misunderstanding is equally problematic. As just
detailed, the court read Dr. Thorne's report to reflect a significantly higher likelihood

of future criminal sexual behavior than Dr. Thorne in fact predicted. But even if the court had correctly interpreted the probability of reoffending associated with Mr. Etheridge's "average" categorization, the court separately misinterpreted the report to suggest that the "average" risk category would still apply to Mr. Etheridge irrespective of how far into the future he is released.

As noted, the district court's decision to "put a lot of weight" on Dr. Thorne's risk-assessment findings (ROA.288, 289) revolved around the court's "fear that Mr. Etheridge is going to reoffend" in the future (ROA.318)—that is, after Mr. Etheridge's release from whatever sentences the court imposed for the instant offenses. In short: the court understood Dr. Thorne's average-risk-category assessment to carry forward to, and apply beyond, the date at which Mr. Etheridge would be released.

The district court's belief that the "average" designation applied regardless of the length of Mr. Etheridge's sentence is also a clearly erroneous reading of Dr. Thorne's report. Dr. Thorne advised that Mr. Etheridge's overall "+1" Static-99R score, and consequent "average" risk designation, were dependent "on the assumption that he could be released into the community prior to his 60th birthday," and that the "overall Static-99R score would be revised" in the event the assumption did not hold true. ROA.487. In other words, the report clearly conveyed that a *different* risk category would obtain if the instant sentences kept Mr. Etheridge imprisoned beyond the age of 60. And the district court was well aware that there was no world in which any

downward-variance sentence it might realistically impose would conform with Dr. Thorne's key assumption. At the time of the sentencing hearing, Mr. Etheridge was several months shy of his 43rd birthday. ROA.352. He faced a Guidelines range of life, the most logical step down from which would be something like 35 years (420 months) or 33 years (405 months). *See* USSG Ch. 5, Pt. A. And the lowest applicable range was 30 years (360 months), with a mandatory minimum of 15 years. ROA.366.

For Mr. Etheridge to remain in the "average" future-risk category even one day after his release, then, the district court would have had to vary downward to a sentence of around 17 years (or 204 months)—at least 13 years below the lowest applicable range and just two years above the mandatory floor. Although the court came into the hearing "open-minded" as to the possibility of a variance (ROA.318), nothing even remotely suggests that the court was entertaining varying to the degree necessary to implicate Dr. Thorne's release-before-60 assumption. Indeed, Mr. Etheridge himself (through counsel) advocated for a below-Guidelines term of between 20 and 30 years as "sufficient to address" the court's public-protection concerns. ROA.293. Thus, even if the district court correctly understood Dr. Thorne's "average" risk designation to project a likelihood of recidivism in the single digits, the court nevertheless premised its sentencing decision on the separately mistaken view that the "average" categorization applied to Mr. Etheridge irrespective of the length of his sentence and his age at release.

### C.   If the Court finds that the district court held a mistaken view of the expert's conclusions, then correction is warranted.

Dr. Thorne's future-risk evaluation loomed large in the district court's decision to gravitate toward a life sentence. While Mr. Etheridge contends that he preserved his procedural and substantive claims of error, he addresses those claims here as though they were not. If this Court agrees that the lower court's view of the doctor's findings was mistaken in either of the ways just described, then the Court should correct that error.

### 1.   A district court's reliance on an incorrect understanding of relevant sentencing evidence is plain procedural and substantive error.

If plain error's first prong is satisfied—that is, if the district court's statements suggest that it held an erroneous view of evidence that mattered to its sentencing decision—then both the resulting procedural and substantive errors are "plain." To determine whether an error is plain, which "is to say, clear or obvious," *Molina-Martinez*, 578 U.S. at 194, this Court "look[s] to the state of the law at the time of appeal" and asks "whether controlling circuit or Supreme Court precedent has reached the issue in question, or whether the legal question would be subject to reasonable dispute." *United States v. Fields*, 777 F.3d 799, 802 (5th Cir. 2015). Both the procedural and substantive errors here satisfy that standard.

The Supreme Court itself has flagged reliance on an erroneous assessment of pertinent sentencing evidence as a "significant procedural error." *Gall*, 552 U.S. at 51. And this Court has routinely found reversible error where the record suggests that a district court's mistaken understanding of the sentencing evidence played a part in its analysis of the Section 3553(a) factors. *See, e.g.*, *United States v. Maldonado*, 726 F. App'x 263, 264 (5th Cir. 2018); *United States v. Hatley*, 717 F. App'x 457, 465-66 (5th Cir. 2018); *United States v. Jimenez-Espinoza*, 408 F. App'x 823, 824-25 (5th Cir. 2011); *United States v. Cruz-Pallares*, 396 F. App'x 170, 172 (5th Cir. 2010); *United States v. Sanchez*, 277 F. App'x 494, 496-97 (5th Cir. 2008); *United States v. Guidry*, 462 F.3d 373, 376-78 (5th Cir. 2006), *overruled on other grounds as noted in United States v. Warfield*, 283 F. App'x 234, 235 (5th Cir. 2008).

This Court, moreover, holds that reliance on an improper sentencing consideration is sufficient to undermine the trial court's substantive assessment of the Section 3553(a) factors, *Cooks*, 589 F.3d at 186, and has applied that rule to the analogous context of a court's reliance on information lacking in sufficient indicia of reliability. *See Zarco-Beiza*, 24 F.th at 481 n.2, 482 ("bare arrest record"); *Foley*, 946 F.3d at 685-86 (same). And it is beyond reasonable dispute that a mistaken view of pertinent evidence counts as an improper sentencing consideration. One need look no further than this Court's long recognition that basing a sentence in part on erroneous or unproven information offends due process. *See Tobias*, 662 F.2d at 388; *accord United States v.*

33

*Johnson*, 648 F.3d 273, 278 (5th Cir. 2011). Indeed, for the right to be sentenced based on accurate information to implicate due process in the first place, it must be the kind of right that is "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Kahler v. Kansas*, 140 S. Ct. 1021, 1027 (2020) (quoted source omitted).

>     **2.    There is a reasonable probability that the errors affected the district court's decision to impose a life sentence, and leaving them uncorrected would undermine the fairness, integrity, and public reputation of judicial proceedings.**

Plain error's third and fourth prongs are also satisfied here. The district court's repeated expressions that it placed "a lot of weight" on Dr. Thorne's risk evaluation, and its openness to a sentence other than life, combine to raise a reasonable probability that the court would choose a lesser sentence with the benefit of a correct understanding of the doctor's findings on remand. And, particularly given the stakes, failing to afford the court the opportunity to reconsider its life sentence in these circumstances would seriously undermine the fairness, integrity, and public reputation of judicial proceedings.

***Third prong***. There is a reasonable probability that the sentencing outcome would be different if the error is corrected. As noted above, this Court has routinely reversed upon finding merit in a defendant's claim that his sentence was based in part on an erroneous understanding of the record. For instance, the Court has refused to

find this error harmless where the district court's statements revealed that it "appeared to rely, to a considerable extent, on the mistaken facts," *Cruz-Pallares*, 396 F. App'x at 172, and where the court's incorrect belief featured prominently in its colloquies with counsel at sentencing. *See Hatley*, 717 F. App'x at 466 (noting court's "erroneous recollection was one of two reasons that [it] gave for overruling" several objections).

Other courts of appeals have reasoned similarly in deeming a sentencing court's reliance on erroneous facts to satisfy plain error's third prong. In one case, for example, "the prominence of" a misapprehension that the defendant had committed additional, uncharged thefts "to the district court's sentencing opinion" led the Sixth Circuit to deem it "plain that [the defendant's] sentence might well have been different" had the court "been aware of the true circumstances of her offense." *United States v. Wilson*, 614 F.3d 219, 225 (6th Cir. 2010). In another, the First Circuit had "no doubt" in the reasonable probability that a lower sentence could result where the trial court's statements revealed that an erroneous understanding of the defendant's criminal record was "a primary reason why" the court viewed "deterrence" as "'the salient factor'" in the case. *United States v. Gonzalez-Castillo*, 562 F.3d 80, 83 (1st Cir. 2009).

Here, as Mr. Etheridge has detailed, there is no doubt that the district court's mistaken impression of the evidence influenced its sentencing decision. The court made clear that the need to protect the public in light of its view of Mr. Etheridge's potential to engage in similar criminal behavior in the future was the primary Section

3553(a) factor that motivated its decision to select life, as opposed to some lesser term. *See* ROA.290-91, 318. The court likewise made clear that its view of that factor rested on its interpretation of Dr. Thorne's report as reflecting an "average chance" that Mr. Etheridge would in fact reoffend—even if exposed to sex-offender treatment over a multi-decade prison term, and without regard to his age upon release. *See* ROA.276, 288-90. And the court expressly stated that it came into the hearing "open-minded" to a nonlife sentence. ROA.318.

These circumstances leave open a reasonable probability that the district court would elect to impose a sentence other than life if properly apprised of the nuances of the doctor's risk evaluation on remand. Had the court appreciated that offenders in the reported "average" risk category are associated with a predicted future recidivism rate of (at most) slightly less than seven percent, and that the known recidivism rates for such offenders are even lower, it would have realized that the chances of Mr. Etheridge reoffending were in fact very low—even in the counterfactual world where he would remain in the "average" category at release. Likewise, had the court appreciated that the "average" classification was predicated on the assumption that Mr. Etheridge could be released before his 60th birthday, and would be revised were he released on or after turning 60, the court would have understood that a sentence of 30 years (or more) would see Mr. Etheridge released at or above age 70, thus triggering a lesser

risk of recidivism. There is reason to think the court would find these differences sa-lient, especially given the "significan[ce]" it attached to Mr. Etheridge's placement in the "average" risk category in relation to the lesser risk reflected in "Ms. Cronkhite's report." ROA.276. In view of the weight the district court professed to attach to its erroneous understanding of Dr. Thorne's risk evaluation, "it would be contrary to logic to conclude that the court's factual error did not affect [Mr. Etheridge]'s substantial rights." *Gonzalez-Castillo*, 562 F.3d at 83.

**Fourth prong**. The Court should correct this error. For one, the district court's reliance on erroneous information in selecting sentence deprived Mr. Etheridge of due process. This Court has "long held that, under the plain error inquiry, errors of consti-tutional dimension will be noticed more freely than less serious errors." *United States v. Knowles*, 29 F.3d 947, 951 (5th Cir. 1994) (citations omitted). And other courts have readily concluded that, in light of the due-process right implicated here, "basing a substantial criminal sentence on a non-existent material fact threatens to compromise the fairness, integrity, or public reputation of the proceedings" and thus warrants plain-error relief. *Gonzalez-Castillo*, 562 F.3d at 83; *accord Wilson*, 614 F.3d at 225 ("We think it appropriate to exercise our discretion in this case, given the general rule that a violation of due process exists when a sentencing judge relies on erroneous infor-mation." (cleaned up)); *United States v. Corona-Gonzalez*, 628 F.3d 336, 342-43 (7th Cir. 2010) (making the same point in deciding to exercise plain-error discretion).

Apart from the constitutional dimension, the Supreme Court has made clear that sentencing errors that raise a reasonable probability of a lesser term in prison are the kind of errors that ordinarily merit correction under plain error's fourth prong. *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907-08 (2018). And there are no "countervailing factors," *id.* at 1909, to suggest this case is not ordinary. To the contrary, the fairness, integrity, and public perception of federal sentencing proceedings are implicated even more so in a case, like this one, where the difference between the possible sentencing outcome upon correction is the difference between life imprisonment and a term of years. This Court should accordingly vacate Mr. Etheridge's life sentence and remand for the district court to reassess the sentence under a correct understanding of the evidence.

**II.    The district court's respective $12,000 and $10,000 restitution awards lack sufficient evidentiary foundation and must be vacated.**

This second issue stems from the government's failure to gather or produce *any* competent evidence of losses incurred by the victims of Mr. Etheridge's offenses. In lieu of actual evidence, the district court was left to speculate—as to both the existence and appropriate amount of recoverable loss—based on unsworn and imprecise statements delivered by the victims' parents at sentencing. The result: arbitrary awards of $12,000 and $10,000 for losses that each parent largely disclaimed and, in any event, would have been readily ascertainable if supporting evidence indeed existed. Neither award can stand given the absence of an adequate evidentiary foundation.

**A.    Ordering restitution in the absence of evidence of recoverable losses is a plain error that necessarily warrants correction.**

"This court reviews the legality of a restitution order de novo and the amount of the restitution order for an abuse of discretion." *United States v. Arledge*, 553 F.3d 881, 897 (5th Cir. 2008). An "'order of restitution that exceeds the victim's actual losses or damages is an illegal sentence.'" *United States v. Chem. & Metal Indus., Inc.* (*C&MI*), 677 F.3d 750, 752 (5th Cir. 2012). Thus, where a defendant claims that ordered restitution "exceeds the statutory maximum because there is no evidence regarding loss," as Mr. Etheridge contends here, that claim is reviewed de novo. *Id*. A defendant who fails to timely object to a restitution order, as is the case here, must clear the plainness, prejudice, and discretion prongs of plain error following de novo

review of the question whether an in-excess-of-the-statutory-maximum error occurred in the first place. *See United States v. Maturin*, 488 F.3d 657, 659-60 (5th Cir. 2007).

This Court's cases make clear, however, that where a defendant satisfies prong one in this context—that is, the restitution order exceeds the statutory ceiling—that error necessarily satisfies each of the remaining plain-error prongs. An error is "plain" if it is "clear under existing law." *Maturin*, 488 F.3d at 663 (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). This Court has held in published decisions that "every dollar [in a given restitution award] must be supported by record evidence," *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012), and that any awarded amount that lacks adequate evidentiary basis makes the award "illegal." *C&MI*, 677 F.3d at 752. And the Court has reversed an award imposed under one of the two restitution statutes at issue here, 18 U.S.C. § 2259, "as lack[ing] record support." *United States v. Villalobos*, 879 F.3d 169, 172 (5th Cir. 2018). It is thus firmly established that a trial court clearly or obviously errs by ordering restitution in the absence of loss evidence sufficient to sustain the award. *See United States v. Austin*, 479 F.3d 363, 373 (5th Cir. 2007) (finding error in awarding restitution in excess of losses "plain").

And, precisely because "excessive restitution awards" unlawfully exceed statutory authorization, this Court has repeatedly held that such awards "cannot be excused [as] harmless error." *Sharma*, 703 F.3d at 322; *accord Arledge*, 553 F.3d at 899

("This court has never applied a harmless error analysis to restitution."). It is, therefore, equally well-established that an excessive restitution order harms the defendant's substantial rights and ordinarily merits an exercise of corrective discretion. *See Austin*, 479 F.3d at 373 ("When a defendant is ordered to pay restitution in an amount greater than the loss caused, the error affects substantial rights as well as the fairness and integrity of the judicial proceeding."); *see also, e.g.*, *United States v. Jimenez*, 692 F. App'x 192, 202 (5th Cir. 2017) (finding third and fourth prongs satisfied); *United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005) (same).

The restitution question presented here, therefore, comes down to whether the district court ordered restitution in the absence of evidence establishing recoverable losses. If the answer is "yes," the foregoing precedent makes clear that the error is plain, prejudicial, and worthy of correction.

## B.    Statutory authority for restitution in this case

The first order of battle in any restitution case is to determine whether an award is permitted, to whom, and for what. Here, the district court's authority to order restitution derived from two different statutes. For the production counts (one and two), the court's restitution authority arose from 18 U.S.C. § 2259, the provision mandating restitution for Section 2251 offenses. *See id.* § 2259(a). The authority to order restitution for the enticement count (three) was governed by 18 U.S.C. § 2429, which mandates restitution for the victims of Section 2422(b) offenses. *See id.* § 2429(a).

The statutes are not identical; but their differences are immaterial to this case. For Mr. Etheridge's offenses,[7] each statute provides that the district court "shall order restitution for any offense under" the relevant "chapter," § 2259(a); § 2429(a); that the order of restitution "shall direct the defendant to pay . . . the full amount of the victim's losses," § 2259(b)(1); § 2429(b)(1); that such an order "shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A," § 2259(b)(3); § 2429(b)(2); and that the term "victim" includes "the legal guardian" of the "individual harmed as a result" of the relevant crime. § 2259(c)(4); § 2429(d). There is one discrepancy of note: Congress has yet to update Section 2429(b)(3)'s cross-reference to Section 2259's definition of the phrase "full amount of the victim's losses," which used to appear at Section 2259(b)(3) but now appears at Section 2259(c)(2). *See United States v. Kempter*, 29 F.4th 960, 969-70 (8th Cir. 2022) (noting this and interpreting discrepancy as a "scrivener's error").

The Court need not take a position on whether the Eighth Circuit is correct however, because any implications of that discrepancy would not affect this appeal. The district court purported to award amounts of losses only in the form of past and future expenses related to psychological or psychiatric therapy. ROA.319-20. While

---

[7] As amended following the Supreme Court's decision in *Paroline v. United States*, 572 U.S. 434 (2014), Section 2259, unlike Section 2429, contains special provisions for restitution in cases in which the defendant "was convicted of trafficking in child pornography." 18 U.S.C. § 2259(b)(2); *see id.* § 2259(b)(2)(A)-(C), (c)(3), (d). But Mr. Etheridge's production convictions (counts one and two) fall outside the statute's definition of "trafficking in child pornography." *See id.* § 2259(c)(3).

Mr. Etheridge maintains that the court plainly erred in doing so in light of the absence of sufficient evidence of any such losses, he acknowledges that—where adequately proved—therapeutic costs that a victim's parent has already incurred, or can reasonably anticipate to incur in the future, would fall within the ordinary meaning of the phrase "full amount of the victim's losses" in Section 2429(b)(1), even without reference to the express inclusion of costs for "medical services relating to . . . psychiatric, or psychological care" in Section 2259(c)(2)'s specific definition of the same phrase.[8]

### C.   The government did not produce evidence sufficient to justify any amount of restitution as to either victim.

Restitution is proper under Sections 2259 and 2429 "only to the extent the defendant's offense proximately caused a victim's losses." *Paroline v. United States*, 572 U.S. 434, 448 (2014). It is the government's burden to demonstrate the amount of the victim's losses that resulted from an offense. *See id.* at 443. "Though it need not be exact, a district court's '[r]estitution order[] should represent an application of law, not a decisionmaker's caprice.'" *Villalobos*, 879 F.3d at 172 (quoting *Paroline*, 572 U.S. at 462). The restitution awards in this case fall into the latter category.

---

[8] Although this Court has not yet addressed the issue in a precedential opinion, other courts of appeals have persuasively interpreted Section 2259 to reach "future therapy expenses as long as the award reflects a reasonable estimate of those costs and is based on record evidence." *United States v. Osman*, 853 F.3d 1184, 1190 (11th Cir. 2017); *accord United States v. Funke*, 846 F.3d 998, 1001 (8th Cir. 2017); *United States v. Laney*, 189 F.3d 954, 966 (9th Cir. 1999). And a panel of this Court has endorsed that view in an unpublished decision. *See United States v. Serrata*, 679 F. App'x 337, 340 & n.3 (5th Cir. 2017).

The government made no attempt to marshal evidence of recoverable losses resulting from Mr. Etheridge's offenses as to either victim, and thus wholly failed to carry its burdens of production and persuasion. No evidence of loss appeared in the presentence report. In the sole declaration-of-losses affidavit attached to the report's addendum, Ms. Trevino (E.E.'s mother) disclaimed the existence of any "counseling expenses" or "future counseling sessions anticipated," and she neither listed any amount of, nor described any factual basis for, her "Yes" answers to the fields for "lost income" and "medical expenses." ROA.379-80. And the trial prosecutor offered no information that might plausibly count as "evidence" of losses, either in his presentencing pleadings or over the course of the one-hour and 12-minute sentencing hearing. To the contrary, the prosecutor's only contribution on the subject of restitution was to twice confirm the *absence* of any evidence of the kind of distribution that, if present, could form the basis for anticipating the victims might incur future "costs and lost income resulting from the trauma of knowing that images of [their] abuse are being viewed over and over," *Paroline*, 572 U.S. at 449. *See* ROA.496 ("Fortunately, the Government does not believe, *nor has any evidence* that the videos of the Minor Victims have been shared to the internet or other sexual predators." (emphasis added)); ROA.315 (reiterating this understanding). In short, *no* competent evidence of loss was placed before the district court.

44

In the absence of any testimonial or documentary evidence that the victims had incurred losses or could reasonably anticipate incurring future losses, and despite the presence of affirmative indications to the contrary, the district court relied on the un-sworn "victim allocution" statement provided at sentencing by the parent of only one of the victims—Mr. Cronkhite, K.C.'s father—to find losses in the amount of $12,000 to K.C. *and* losses in the amount of $10,000 to E.E. ROA.319-20. This was error on multiple fronts.

To begin, as a victim of only two of the three offenses (counts one and three), Mr. Cronkhite's statement could not possibly have supported a finding of loss suffered by a separate victim (E.E., and by extension Ms. Trevino) of an entirely separate of-fense (count two). The district court's speculation "that Victim 2 [E.E.] is going to need similar care based on the [unsworn statements][9] on behalf of Victim 1 [K.C.]," ROA.320, thus impermissibly substituted what the court perceived (incorrectly) as proof of losses as to K.C. for evidence of losses specific to the offense involving E.E. That alone suffices to invalidate the $10,000 order as to count two.

At any rate, the $10,000 order cannot stand in light of Ms. Trevino's statements in her sworn affidavit—the only actual evidence produced relevant to count two—and in her unsworn allocution at the sentencing hearing. The sworn affidavit advised that

---

[9] The district court erroneously referred to Mr. Cronkhite's statements as "testimony" here. ROA.320. But, as the court itself explained to Mr. Cronkhite prior to allowing him to speak, his "victim allocution" was "not under oath" and thus was not, in fact, testimony. ROA.296.

Ms. Trevino had incurred no counseling expenses to date and did not anticipate any future expenses. ROA.379-80. And at the hearing, Ms. Trevino corroborated those declarations. She confirmed, unequivocally, that she had not incurred any expenses for E.E.'s then-discontinued therapy: it "was all free"; she "didn't pay for anything." ROA.309. As to future therapy, Ms. Trevino made clear that, while she feared "there may be expenses in the future," she was "hoping that's not the case" and "just d[id]n't know." ROA.310. And at no point did she indicate that she would opt not to utilize the same state-provided, free counseling services if the need ever arose. In short, Ms. Trevino's unsworn oral statements on behalf of E.E. corroborated her sworn affidavit declaring the nonexistence of past or anticipated future therapy expenses resulting from the only offense for which she was a victim: count two.

The district court was not free to ignore Ms. Trevino's sworn declaration and unsworn confirmation of the absence of any offense-related loss and instead arbitrarily award $10,000 based on the unsworn statements of a separate victim of separate offense conduct. By doing just that, the court erred.

Nor can Mr. Cronkhite's unsworn allocution sustain the $12,000 award to K.C. At the hearing, Mr. Cronkhite initially disclaimed any discernable amount of losses, and he only estimated that counseling had thus far cost him $2,000 after the district court repeatedly pressed him to do so. ROA.304-05. But Mr. Cronkhite gave no contextual, fact-based footing for the $2,000 number, such as the price of any individual

counseling session, the psychologist's hourly rate, or the number of sessions K.C. had attended.

The absence of any evidentiary support for that estimation of losses already incurred, in turn, eliminates any plausible basis to credit Mr. Cronkhite's acquiescence with the court's suggestion that he could reasonably expect to incur the same rate of counseling expenses for "the next five or six years at least." ROA.305-06. Moreover, Mr. Cronkhite informed the court that he (1) had neither "considered" nor "discussed" with K.C.'s "current psychologist" the likelihood of future emotional trauma that could necessitate further counseling, and (2) was in fact "looking for a different [psychologist]." ROA.303. In other words, the court knew Mr. Cronkhite had not, in fact, received any considered advice or put any considered thought into the likelihood or extent of possible future counseling expenses. And it knew that, whatever future therapy costs Mr. Cronkhite might incur, those costs would be billed (if at all) by a different psychologist whose rate was just as unknown as the current psychologist's rate.

Sufficiently reliable evidence, this is not. Neither the presentence report nor the prosecutor supplied any evidentiary footing for any amount of recoverable losses incurred by the minors or their parents. Ms. Trevino's statement confirmed the *absence* of any actual or reasonably foreseeable losses as to E.E. And Mr. Cronkhite's statement amounted to no more than an unreliable guess devoid of any discernible factual basis—indeed, he informed the court that he "honestly [was] not sure" of the "cost to

date" and "[h]onestly . . . preferr[ed] not to" estimate. ROA.304. The district court's

decision to order Mr. Etheridge to pay a combined $22,000 in restitution thus lacks an

adequate evidentiary basis, exceeds the statutory maximum, and must be vacated. *See,*

*e.g.*, *Villalobos*, 879 F.3d at 172 (vacating restitution order where the record contained

no competent evidence of loss); *C&MI*, 677 F.3d at 752 (same).

### D. The appropriate remedy is to vacate the restitution awards and render a judgment of no restitution.

As noted, this Court's cases make clear that a restitution award in excess of the

victim's actual losses cannot be harmless. *See Sharma*, 703 F.3d at 323; *Arledge*, 553

F.3d at 899. The question remains, however, whether the government should be af-

forded a second opportunity to carry its restitutionary burden.

It should not. This Court's precedent makes clear that, in the restitution context,

"[t]he government generally may not present new evidence on remand when reversal

is required due to the failure to present evidence originally." *C&MI*, 677 F.3d at 753

(citation omitted). In *C&MI*, this Court applied that general rule to an unsupported

restitution order, holding that the proper remedy for the government's failure to pro-

duce any evidence of pecuniary loss in the district court was to vacate the restitution

award without remand. *See id.* at 752-53. The same result is proper here where, as in

*C&MI*, the government "had a chance to prove the amount of loss during the original

proceeding before the district court" but did not.

And, as in *C&MI*, this is a case in which no "special circumstances" excuse the government's failure. *Id.* at 753. This Court recently discussed the kinds of "special circumstances" that might justify departing from the general no-second-chance rule in *Villalobos*; those circumstances include:

(1)  "where the government's burden was unclear";

(2)  "where the trial court prohibited discussion of the issue";

(3)  "where the evidence was, for a good reason, unavailable"; and

(4)  "where the victims sought to assist the government in calculating the proper restitution amount and 'the harm from the Government's failure to present sufficient evidence to the district court [wa]s to the victims.'"

*Villalobos*, 879 F.3d at 172 (quoting *United States v. Archer*, 671 F.3d 149, 168 (2d Cir. 2011), as to (1)–(3), and *United States v. Jimenez*, 692 F. App'x 192, 203 (5th Cir. 2017), as to (4)).

None of these circumstances exist here. The government's burden as to restitution was clear. *See* 18 U.S.C. §§ 2259(b)(3), 2429(b)(2) & 3664(e); *Paroline*, 572 U.S. at 443. The district court in no way prevented the government from broaching the subject of restitution; to the contrary, the prosecutor twice *refused* the court's invitation to ask anything of the parents following their respective allocutions. ROA.306, 312. There is no indication that information relevant to past or anticipated future therapy expenses was unavailable, let alone for good reason. And, unlike *Jimenez*, this is not a case where the victims supplied a letter detailing factual bases for claimed losses

that the prosecutor simply neglected to enter into the district court record. *See* 692 F. App'x at 202-03. To the contrary, the record contains Ms. Trevino's affidavit declaring no losses of the type the court ultimately ordered; Mr. Cronkhite supplied no affidavit; and neither victim sketched out a factual basis for past or reasonably likely future therapy expenses despite speaking, albeit unsworn, at sentencing. This Court should accordingly vacate the restitution awards and either render judgment of no restitution or remand with instructions to confine any further proceedings on this issue to the present state of the record.

# CONCLUSION

On Issue One, the Court should vacate Mr. Etheridge's prison sentence and remand for resentencing. On Issue Two, the Court should vacate the district court's restitution awards and either render judgment of no restitution or remand with instructions to confine any further proceedings on that subject to the present state of the record.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

s/ *Evan G. Howze*
EVAN G. HOWZE
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002
Telephone: (713) 718-4600

## CERTIFICATE OF SERVICE

I certify that this brief was served upon counsel for the appellee by notice of electronic filing with the Fifth Circuit CM/ECF system.

s/ *Evan G. Howze*

EVAN G. HOWZE

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) & (f) because it contains 12,277 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 software in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

3.  This brief was filed electronically, in native Portable Document File (PDF) format, via the Fifth Circuit's CM/ECF system.

4.  This brief complies with the privacy-redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

5.  This brief complies with the electronic-submission requirement of 5th Cir. R. 25.2.1 because it is an exact copy of the paper document.

6.  This brief has been scanned for viruses with the most recent version of a commercial antivirus scanning program and is free of viruses.

s/ *Evan G. Howze*

EVAN G. HOWZE