# No. 22-40516

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
                    Plaintiff-Appellee,

v.

REID ETHERIDGE,
                    Defendant-Appellant.

On Appeal from the United States District Court
For the Southern District of Texas
McAllen Division, Criminal No. 7:20-CR-01791

BRIEF OF PLAINTIFF-APPELLEE

ALAMDAR S. HAMDANI
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

LAURETTA DRAKE BAHRY
Assistant United States Attorney
Attorneys for Appellee
1000 Louisiana, Suite 2300
Houston, Texas 77002
(713) 567-9102

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is unnecessary in this case. The facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. Fed. R. App. P. 34(a)(2)(C).

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES........................................................v

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE ................................................................2

    A.    Course of Proceedings and Disposition Below........................2

    B.    Statement of Facts. ................................................................3

        1.    Etheridge's incestuous rape of his four-year-old daughter "E.E." and sexual assault of Cronkhite's six-year-old daughter "K.C." ............................................3

            a.    October 7, 2020, search of Cronkhite's residence.............................................................6

            b.    Etheridge recorded the incestuous rapes of his four-year-old daughter "E.E." and the sexual assaults of six-year-old "K.C."...................8

        2.    The psychologist's report. ............................................12

        3.    Sentencing memoranda. ...............................................16

        4.    Victim impact statements............................................19

        5.    The sentencing hearing................................................20

SUMMARY OF THE ARGUMENT .......................................................29

# **TABLE OF CONTENTS, cont'd**

**Page**

ARGUMENT ........................................................................ 32

I.    The sentence of life imprisonment is procedurally and substantively reasonable under plain-error review. ............ 32

    A.    Plain-error review. ...................................................... 32

    B.    Zero evidence exists that the district court misunderstood Dr. Thorne's report. ............................ 38

II.   The district court did not plainly err in awarding $12,000 in restitution for "K.C." and $10,000 in restitution for "E.E." ............................................................ 44

    A.    Standard of review. ..................................................... 44

    B.    Title 18 U.S.C. §§ 2259 & 2429 authorized restitution for "K.C." and "E.E." ................................ 45

        1.    Title 18 U.S.C. § 2259. ...................................... 45

        2.    Title 18 U.S.C. § 2429. ...................................... 47

    C.    No error that is clear and obvious exists with the restitution awards. ..................................................... 49

        1.    The $12,000 restitution award for six-year-old "K.C." ............................................................ 52

        2.    The $10,000 restitution award for "E.E." ........... 56

CONCLUSION .................................................................... 61

## **TABLE OF CONTENTS, cont'd**

**Page**

CERTIFICATE OF SERVICE ................................................................ 62

CERTIFICATE OF COMPLIANCE ..................................................... 63

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                    <u>Page(s)</u>

*Ballard v. Burton*, 444 F.3d 391 (5th Cir. 2006) ....................................33

*Gall v. United States,* 552 U.S. 38 (2007) .........................................32, 33

*Holguin-Hernandez v. United States,*
    __ U.S. __, 140 S. Ct. 762 (2020) ..................................34, 35, 36, 37

*Molina-Martinez v. United States,* 578 U.S. 189 (2016).........................33

*Paroline v. United States,* 572 U.S. 434 (2014).......................................45

*United States v. Baker*, 672 F. Supp. 2d 771 (E.D. Tex. 2009).........51, 57

*United States v. Alvarado*, 691 F.3d 592 (5th Cir. 2012) .......................43

*United States v. Cabello,* 33 F.4th 281 (5th Cir. 2022)............................38

*United States v. Cantu-Ramirez,* 669 F.3d 619 (5th Cir. 2012) .............41

*United States v. Castillo,* 430 F.3d 230 (5th Cir. 2005).........................32

*United States v. Chavez-Hernandez,* 671 F.3d 494 (5th Cir. 2012)........36

*United States v. Chem. & Metal Indus., Inc.,* 677 F.3d 750
    (5th Cir. 2012) ...............................................................................50

*United States v. Clemens,* 990 F.3d 1127 (8th Cir. 2021)......................46

*United States v. Coto-Mendoza,* 986 F.3d 583 (5th Cir.),
    *cert. denied,* 142 S. Ct. 207 (2021)......................................33, 34, 37

*United States v. Crandon,* 173 F.3d 122 (3d Cir. 1999)..........................59

v

# TABLE OF AUTHORITIES, cont'd

**Cases**                                                                                              **Page(s)**

*United States v. Cruz-Pallares,* 396 F. App'x 170
    (5th Cir. 2010) ................................................................................. 39

*United States v. Danser,* 270 F.3d 451 (7th Cir. 2001) ......... 53, 54, 55, 56

*United States v. DeHate,* 2016 WL 3549349
    (E.D. Mich. June 30, 2016) ............................................................. 51

*United States v. Doe*, 488 F.3d 1154 (9th Cir. 2007) ................. 49, 53, 55

*United States v. Futrell*, 209 F.3d 1286 (11th Cir. 2000) ................ 49, 56

*United States v. Guidry,* 462 F.3d 373 (5th Cir. 2006),
    *overruled on other grounds as noted in United States v.*
    *Warfield,* 283 F. App'x 234 (5th Cir. 2008) ................................... 40

*United States v. Guzman-Reyes,* 853 F.3d 260 (5th Cir. 2017) ............. 39

*United States v. Hatley,* 717 F. App'x 457 (5th Cir. 2018) ..................... 39

*United States v. Hebron,* 684 F.3d 554 (5th Cir. 2012) .......................... 49

*United States v. Jimenez,* 692 F. App'x 192 (5th Cir. 2017)
    (unpublished) ............................................................................. 59, 60

*United States v. Jimenez-Espinoza,* 408 F. App'x 823
    (5th Cir. 2011) ................................................................................. 39

*United States v. Johnson,* 680 F. App'x 194
    (4th Cir. Feb. 28, 2017) (unpublished) .......................................... 55

*United States v. Jones*, 815 F. App'x 870 (6th Cir. 2020)
    (unpublished) ................................................................................... 46

# TABLE OF AUTHORITIES, cont'd

**Cases**                                                                      **Page(s)**

*United States v. Jones,* No. 21-10916, 2022 WL 807997
  (5th Cir. 2022) (unpublished) ........................................................... 33

*United States v. Julian,* 242 F.3d 1245 (10th Cir. 2001) ........................ 53

*United States v. Kearney,* 672 F.3d 81 (1st Cir. 2012) ..................... 49, 59

*United States v. Kempter*, 29 F.4th 960 (8th Cir. 2022) ................... 47, 48

*United States v. Kennedy*, 643 F.3d 1251 (9th Cir. 2011) ...................... 49

*United States v. Laney*, 189 F.3d 954 (9th Cir. 1999) ....................... 53, 54

*United States v. Leal,* 933 F.3d 426 (5th Cir. 2019) ................... 44, 46, 59

*United States v. Maldonado,* 726 F. App'x 263 (5th Cir. 2018) .............. 39

*United States v. McLaughlin,* 847 F. App'x 573 (11th Cir.),
  *cert. denied,* 142 S. Ct. 222 (2021) (unpublished) .......................... 43

*United States v. Miller*, 2015 WL 6689363 (E.D. Mich. 2015) .............. 51

*United States v. Mobasseri,* 828 F. App'x 278 (6th Cir. 2020)
  (unpublished) .................................................................................... 46

*United States v. Olano,* 507 U.S. 725 (1993) ......................................... 38

*United States v. Osman,* 853 F.3d 1184 (11th Cir. 2017) ....................... 58

*United States v. Penn,* 969 F.3d 450 (5th Cir. 2020) ............................. 45

*United States v. Reasor,* 541 F.3d 366 (5th Cir. 2008) ..................... 49, 53

*United States v. Reese,* 998 F.2d 1275 (5th Cir. 1993).... 49, 52, 55, 56, 57

## **TABLE OF AUTHORITIES, cont'd**

**Cases**                                                                **Page(s)**

*United States v. Sanchez,* 277 F. App'x 494 (5th Cir. 2008)..................39

*United States v. Sanchez,* No. 22-40133, 2022 WL 17250178
    (5th Cir. 2022) (unpublished).............................................43, 44, 48

*United States v. Trader,* 981 F.3d 961 (11th Cir. 2020) ........................43

*United States v. Vargas*, 21 F.4th 332 (5th Cir. 2021) ...........................33

*United States v. Vickers,* 683 F. App'x 393 (6th Cir. 2017)
    (unpublished)....................................................................................43

*United States v. Villalobos,* 879 F.3d 169 (5th Cir. 2018) .............. *passim*

*United States v. Wares,* 689 F. App'x 719 (3d Cir. 2017)
    (unpublished)....................................................................................43

*United States v. Whitelaw,* 580 F.3d 256 (5th Cir. 2009) ......................33

*United States v. Zarco-Beiza,* 24 F.4th 477
    (5th Cir. 2022) ...................................................................35, 37, 38

**Statutes and Rules**

18 U.S.C. § 1593(b)(3)...............................................................................48

18 U.S.C. § 2251(a) .....................................................................2, 11, 45

18 U.S.C. § 2252(a) ...................................................................................59

18 U.S.C. § 2259 ...........................................................44, 45, 46, 48, 53

18 U.S.C. § 2259(a)...........................................................................45, 48

## TABLE OF AUTHORITIES, cont'd

**Statutes and Rules**                                                      **Page(s)**

18 U.S.C. § 2259(b)(2)(A)................................................................45

18 U.S.C. § 2259(b)(2)(B)................................................................46

18 U.S.C. § 2259(b)(3)..............................................................47, 48

18 U.S.C. § 2259(b)(4)(B)(ii) ........................................................59

18 U.S.C. § 2259(c)(2) ............................................................46, 48

18 U.S.C. § 2259(c)(2)(A) ...............................................................46

18 U.S.C. § 2259(c)(2)(B) ...............................................................46

18 U.S.C. § 2259(c)(2)(F) ...............................................................46

18 U.S.C. § 2259(c)(4) .....................................................................46

18 U.S.C. § 2422(b) ...........................................................2, 11, 47

18 U.S.C. § 2429 ...............................................................................47

18 U.S.C. § 2429(a) ..........................................................................47

18 U.S.C. § 2429(b) ..........................................................................48

18 U.S.C. § 2429(b)(1)..............................................................47, 48

18 U.S.C. § 2429(b)(2)......................................................................48

18 U.S.C. § 2429(b)(3)..............................................................47, 48

18 U.S.C. § 2429(d).........................................................................46

# TABLE OF AUTHORITIES, cont'd

## Statutes and Rules                                    Page(s)

18 U.S.C. § 3231 ................................................................................1

18 U.S.C. § 3553(a)........................................ 19, 20, 33, 42, 43

18 U.S.C. § 3553(a)(1)........................................ 17, 18, 30, 41

18 U.S.C. § 3553(a)(2)....................................................................17

18 U.S.C. § 3553(a)(2)(C) ........................................ 30, 41, 42

18 U.S.C. § 3663 ............................................................................47

18 U.S.C. § 3663A..........................................................................47

18 U.S.C. § 3664(e) ......................................................................48

18 U.S.C. § 3742(a) ........................................................................1

28 U.S.C. § 1291 ..............................................................................1

Fed. R. App. P. 4(b)(1)(A) ........................................................1

Fed. R. App. P. 34(a)(2)(C) ......................................................i

Fed. R. Crim. P. 52(b)................................................................37

5th Cir. R. 28.2.2 ..........................................................................1

5th Cir. R. 47.5.4 ........................................................................33

## United States Sentencing Guidelines

U.S.S.G. § 5K2.12................................................................................16

## STATEMENT OF JURISDICTION

Reid Etheridge appeals from the judgment of conviction and sentence entered on July 29, 2022. ROA.13, 166.[1] The district court (Crane, J.) had jurisdiction under 18 U.S.C. § 3231. Etheridge filed a timely notice of appeal on August 3, 2022, under Fed. R. App. P. 4(b)(1)(A). ROA.13, 173-74. This Court's jurisdiction vests under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

---

[1] "ROA" refers to the record on appeal, which is cited in accordance with 5th Cir. R. 28.2.2.

## STATEMENT OF THE ISSUES

I.     Is the life sentence procedurally and substantively reasonable under plain-error review?

II.     Is the amount of restitution for losses to "K.C." and "E.E." plainly erroneous?

## STATEMENT OF THE CASE

### A.     Course of Proceedings and Disposition Below.

Etheridge and his co-defendant, Alicia Cronkhite, were charged in a six-count indictment for sexual offenses against children.  ROA.39-42. Etheridge pleaded guilty under a written plea agreement to two counts of production of child pornography, in violation of 18 U.S.C. § 2251(a) (Counts One & Two) and coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b) (Count Three).  ROA.324-26.  The plea agreement did not contain an appellate waiver.    The district court imposed concurrent 360-month sentences on Counts One & Two to run concurrently with a life sentence on Count Three.  ROA.167, 321.[2]

---

[2] The court mistakenly referred to Count Three as Count Four during the sentencing hearing.  ROA.194, 321.

2

**B.    Statement of Facts.**

> 1.    <u>Etheridge's incestuous rape of his four-year-old daughter "E.E." and sexual assault of Cronkhite's six-year-old daughter "K.C."</u>

The plea agreement did not contain a factual basis, therefore the summary below comes from the undisputed facts in the PSR. The Department of Homeland Security (DHS), Homeland Security Investigation (HSI), and the Rio Grande Valley Child Exploitation Investigation Task Force (RGV CEITF) unit in McAllen, Texas, participated in the investigation of this case. ROA.330; PSR ¶ 9. On October 1, 2020, Special Agents with RGV CEITF responded to a referral from the National Center for Missing and Exploited Children (NCMEC) about a suspect who was producing and uploading 323 images and video files of child pornography to a Google account. ROA.330; PSR ¶ 10. The Google account was registered to Etheridge. ROA.330; PSR ¶ 11. Multiple files were produced by Etheridge and uploaded to his email account. ROA.330; PSR ¶ 10. The agents picked a representative sample of three files to confirm the presence of child pornography. ROA.330; PSR ¶ 12. The first video file, approximately 30 seconds in length, depicted a minor child aged four to five sitting on a bed.

ROA.330-31; PSR ¶ 13.  An adult male stood next to the bed and forced the minor to perform oral copulation on his erect penis for the entirety of the video.  ROA.331; PSR ¶ 13.

The second video file, approximately 42 seconds in length, depicted a minor child aged four to five years old standing in a bathroom.  An adult male masturbated and encouraged the child to manually stimulate and perform oral copulation on his erect penis.  ROA.331; PSR ¶ 14.

The third video file, approximately 33-seconds in length, depicted a minor child approximately four to five years old.  ROA.331; PSR ¶15.  An adult male masturbated and forced the minor female child to perform oral copulation on his erect penis.  ROA.331; PSR ¶ 15.  After agents viewed these three representative samples, the investigation continued. ROA.331; PSR ¶ 15.

On October 2, 2020, Special Agents executed a federal search warrant at Etheridge's house in McAllen, Texas.  ROA.331; PSR ¶ 16. Agents discovered text messages and images indicative of the production of child pornography transferred between Etheridge and Cronkhite, one of the contacts on Etheridge's phone.  ROA.331; PSR ¶ 16.  An excerpt from one of their text messages appears below:

08/13/2020: from **Reid Etheridge**: "Now send sexy pics"
08/13/2020: from Alicia Cronkhite: "Of (minor victim "K.C.")? I promise I will try hahaha"
09/06/2020: from **Reid Etheridge**: "Send pics of her (referring to minor victim K.C.) snatch hahaha"
09/06/2020: from Alicia Cronkhite: I was poking (minor victim K.C.'s) labia and she isn't moving hahaha"
09/06/2020: from **Reid Etheridge**: "in one of those photos of her pussy (referring to minor victim K.C.) you can start to see the beginnings of secondary sexual characteristics."

ROA.355; PSR ¶ 16.  During the conversation, Cronkhite sent Etheridge photographs of her daughter's (minor victim "K.C.") vagina.  ROA.331; PSR ¶ 17.

After agents arrested Etheridge, he gave a voluntary post-arrest statement.  ROA.331; PSR ¶ 18.  He admitted that he had downloaded child exploitation material on his Google account, accessed the child exploitation images and videos from his Google cellular telephone, understood that his practice of collecting pornography of children under the age of 18 was illegal, and admitted to becoming sexually aroused and to masturbating while watching child pornography.  ROA.331-32; PSR ¶ 18.

When the agents showed Etheridge an image of a minor female from the investigative file, Etheridge admitted that "E.E." was his four-year-old daughter.  ROA.332; PSR ¶ 18.  He admitted that he was the

adult male subject in the image touching and engaging in sexual conduct with "E.E."  He admitted rubbing his erect penis on "E.E.'s" vagina.  ROA.332; PSR ¶ 18.  Etheridge recalled six occasions in which he engaged in sexual conduct with his daughter and recorded his acts using his phone.  ROA.332; PSR ¶ 18.  After he recorded the sexual assaults, he would automatically upload the video and image files to his Google account.  ROA.332; PSR ¶ 18.  "E.E." was four years old at the time of the recorded assaults.  ROA.332; PSR ¶ 18.  The sexual assaults occurred at Etheridge's house and his mother's house.  ROA.332; PSR ¶ 18.  He also admitted that he had engaged in sexual activity with other children.  ROA.332; PSR ¶ 18.

### a. October 7, 2020, search of Cronkhite's residence.

During the execution of a search warrant at Cronkhite's house, agents encountered Cronkhite and a minor female child.  ROA.332; PSR ¶ 19.  Cronkhite gave the following voluntary post-arrest statement.  ROA.332; PSR ¶ 20.  Etheridge was Cronkhite's ex-boyfriend and they had dated for approximately two years.  Although she had moved out of Etheridge's house, they still texted each other and Etheridge would send her pornography "including videos of midgets and Asian 'lady boys.'"

6

ROA.332-33; PSR ¶ 20.   During the two years that they had dated, Etheridge had access to her six-year-old daughter, "K.C."  She knew that Etheridge took photographs of "K.C." bathing.  Cronkhite reported that Etheridge made her take sexually explicit images of "K.C."  ROA.333; PSR ¶ 20.  She left Etheridge in January/February because of his sexual interest in children but conceded that she continued to communicate with him until October 1, 2020.   Cronkhite knew that Etheridge would occasionally take sexual images of six-year-old "K.C." but she did nothing to stop it.  When agents showed Cronkhite an image of "K.C" lying nude on the bed in Cronkhite's bedroom, she confirmed that she had taken the photo and sent it to Etheridge.  Agents then showed her an image of an exposed vagina of a minor female child being spread open by an adult hand.  Cronkhite admitted that she had taken the picture of "K.C." and sent it to Etheridge.  According to Cronkhite, Etheridge asked her to sexually abuse six-year-old "K.C." and told her that he wanted to have sex with her child.  Etheridge walked around nude in front of "K.C." and sent Cronkhite images of his four-year-old daughter "E.E." rubbing his penis.  He asked Cronkhite to produce child pornography of "K.C." on approximately 10 occasions.  ROA.333; PSR ¶ 20.

7

> **b. Etheridge recorded the incestuous rapes of his four-year-old daughter "E.E." and the sexual assaults of six-year-old "K.C."**

On October 14, 2020, agents executed a search warrant for Etheridge's Google account. An extensive review of the information was conducted and the following five files provided a representative sample.

The first video file, approximately 25 seconds in length, depicted four-year-old victim "E.E." and Etheridge. ROA.333; PSR ¶ 22. "E.E." appeared on the bed nude from the waist down. Etheridge was also nude from the waist down. Etheridge vaginally penetrated "E.E." with his erect penis. Approximately 16 seconds into the video, the camera panned up and showed Etheridge holding up a black cellular telephone and recording himself vaginally penetrating four-year-old "E.E." The camera panned back down and recorded a close-up view of Etheridge's erect penis vaginally penetrating "E.E." for the remainder of the video. ROA.334; PSR ¶22.

The second video file is approximately two minutes and thirty-eight seconds in length. Four-year-old "E.E." sat on a couch at Etheridge's residence wearing only leggings. Etheridge masturbated his erect penis while "E.E." sat on his lap. At time stamp fifty-four seconds, "E.E."

climbed off Etheridge's lap and he stood up, removed "E.E.'s" leggings, and began to change her diaper. After he removed "E.E.'s" diaper and wiped her vagina, Etheridge knelt between "E.E.'s" legs, forced his erect penis into "E.E.'s" exposed vagina and vaginally penetrated her for the remainder of the video. ROA.334; PSR ¶ 23.

The third file, approximately 1 minute and 6 seconds in length, showed six-year-old "K.C." lying on a bed wearing a t-shirt and shorts. Etheridge was also on the bed completely nude. "K.C." stimulated Etheridge's erect penis for the camera while Etheridge smiled. The masturbation continued for the remainder of the video. ROA.334; PSR ¶24.

The fourth file, approximately 26 seconds in length, showed "K.C." in a living room. Cronkhite appeared on the video leaning against a couch eating soup. Etheridge sat on the couch wearing a black shirt and gray underwear pulled to the side to expose his erect penis. While "K.C." stimulated Etheridge's exposed and erect penis with her hand, Cronkhite told "K.C." that she would eat all of the cinnamon rolls. When "K.C." protested, Cronkhite poked her in the cheek with a spoon. During the entire conversation with "K.C.," Cronkhite sat next to "K.C." watching

and smiling while her daughter stimulated Etheridge's erect penis. ROA.334-35; PSR ¶ 25.

The fifth video file, approximately 16 seconds in length, appeared to be a continuation of the fourth video depicting the sexual assault of "K.C." because it occurred in the same living room. "K.C." wore the same clothes that she wore in the fourth video file. Cronkhite and Etheridge sat on the couch wearing the same clothes as in the fourth video. Etheridge's gray underwear was pulled aside to expose his erect penis. "K.C." asked, "They never play with people's penises like me?" Etheridge responded, "Do you like my penis, do you like it a lot?" "K.C." replied "Yes" and nodded. "K.C." asked, "Is this pee stuff?" Etheridge responded "Yes" at the end of the video. ROA.335; PSR ¶ 26.

The probation officer summarized Etheridge's role in the offense as follows:

> Reid Etheridge's role in the instant offense was to produce and upload multiple files of child exploitation material to his Google account etheridge.***@ gmail.com. Reid Etheridge would sexually assault his daughter, identified as E.E., a four-year-old-female, he would film the sexual assaults utilizing his cellular telephone as a recording device, and he would upload the files to his Google account. In addition, Reid Etheridge would communicate with co-defendant, Alicia Cronkhite, via text messages. Reid Etheridge would request Alicia Cronkhite to produce child exploitation material of her

daughter, identified as K.C., a six-year-old female, to which Alicia Cronkhite would comply. Alicia Cronkhite sent several photographs, utilizing her cellular telephone, depicting the lewd and lascivious display of minor victim K.C.'s vagina. Alicia Cronkhite and Reid Etheridge also arranged to meet for the purpose of allowing Reid Etheridge to engage in sexual acts with K.C. Reid Etheridge also produced child exploitation material involving K.C. in the presence of Alicia Cronkhite.

ROA.359-60; PSR ¶ 29.

With respect to Counts One and Two, production of child pornography, the mandatory minimum term of imprisonment is 15 years and the maximum is 30 years under § 2251(a). Etheridge's adjusted offense level of 43 automatically resulted in life imprisonment under the Chapter 5 Part A of the advisory Guidelines. ROA.339; PSR ¶ 59[3]. However, because the statutory maximum is 30 years, the guideline imprisonment range became 360 months. ROA.342; PSR ¶ 75.

With respect to Count Three, coercion of a minor, the mandatory minimum term of imprisonment is 10 years and the maximum is life imprisonment under § 2422(b). ROA.342; PSR ¶ 77. Based upon a total

---

[3] Etheridge's original offense level was 46, which exceeded the maximum level of 43, because of numerous Chapter Two adjustments. ROA.337-39; PSR ¶ 54.

offense level of 43 and a criminal history category I, the advisory guideline range became life imprisonment.  ROA.342; PSR ¶ 78.

### 2.     The psychologist's report.[4]

At the time of his arrest, 41-year old Etheridge worked as a professor in the Mathematics Department at South Texas College in McAllen, earning $53,000 a year.  ROA.341; PSR ¶ 72.  Prior to sentencing, Etheridge sought a court-appointed psychologist to assess his risk of recidivism.  ROA.87.  In his request, Etheridge acknowledged that he faced a life sentence.  ROA.400.  The court eventually appointed psychologist Dr. Stephen Thorne, Ph.D., to conduct the assessment after numerous orders requesting that Etheridge comply with financial and other statutory requirements.  ROA.407-09, 411-13, 415-20, 464.

Dr. Thorne conducted a three-hour interview with Etheridge by videoconference during which he administered two psychological and actuarial assessments to predict recidivism:  the Risk for Sexual Violence Protocol (RSVP); and the Static-99R.  ROA.469-70.  The doctor also

---

[4] Etheridge's last name is misspelled in the report.  *Compare* ROA.39, 324 *with* ROA.469-82.

assessed "research-based risk factors" and "relevant mitigating factors." ROA.480-81.

During the interview, Etheridge acknowledged that he had engaged in sexually deviant behavior with his pre-pubescent daughter and Cronkhite's pre-pubescent daughter. ROA.470. He further acknowledged viewing, producing, and distributing images of child pornography. ROA.470. The doctor's factual recitation of the offenses of conviction tracked the undisputed facts in the PSR. *Compare* ROA.470-76 *with* ROA.330-36.

Dr. Thorne administered the RSVP, which consisted of 22 risk factors related to: sexual violence history; psychological adjustment; mental disorder; social adjustment; and manageability. ROA.477. The doctor used the presence or absence of the risk factors to assess Etheridge's risk for future sexual violence. ROA.477. Dr. Thorne concluded that "Mr. Etheridge is a 'moderate' risk for future sexual recidivism, with such an opinion being largely influenced by his alleged lack of additional (independent of the circumstances relating to the instant offenses) documented (via arrest or conviction) sexually deviant/violent behavior, his apparent history (for much of his adult life)

of employment stability, a lack of documented (via arrest or conviction) non-sexually criminality and/or violent behavior, and (since being arrested and detained in October 2020) his overall institutional adjustment. Nevertheless, the doctor identified "areas of concern:"

- Etheridge's history of unhealthy alcohol use and what may be considered significant psychiatric symptomatology;

- a history of relationship instability and limited/ineffective coping skills;

- a reported history (growing up) of being physically and sexually abused by his biological father and an adult female friend of his biological mother;

- his apparent lack of insight into the various aspects of his own functioning;

- a history of excessive and/or unhealthy alcohol use, and

- the fact that the instant offenses [sic] consistent of Mr. Etheridge having (on numerous occasions over time) engaged in various sexually deviant acts with his 3-4 year-old biological daughter and a 6-year-old extrafamilial girl victim (and also having produced and distributed acts of child pornography relating to these sexually deviant acts).

ROA.477-78.

Etheridge's "+1" score on the Static-99R placed him in the "Average" risk category for committing another sex offense. ROA.478.

Etheridge's score was "based on [sic] assumption that he would be released into the community prior to his 60th birthday; if he is released into the community on, or after, his 60th birthday, his overall Static-99R would be revised." ROA.478. Recidivism predictions for "+1" scores for five years ranged from 2.7% to 3.7% and 10 years ranges from 3.9% to 6.7%. ROA.478.

Under "Summary and Opinions" Dr. Thorne made the following conclusions. With respect to Etheridge's sexual assaults on his four-year-old biological daughter "E.E." and the six-year-old extrafamilial female victim "K.C.," Dr. Thorne indicated that the victim characteristics were important. ROA.480. Relying on "research-based risk factors," the doctor noted that offenders who target younger boy victims and extrafamilial victims (instead of incestual victims) were at higher risk for reoffending. ROA.480. "K.C." was an extrafamilial victim. ROA.333; PSR ¶ 20.

Under "research-based risk factors," the doctor noted disturbing details related to prior acts of bestiality and incest:

> Mr. Etheridge did report having (primarily, though not exclusively, while in college) engaged in excessive masturbation, having (on 1 occasion as a teenager) inserted his penis into a female dog's vagina (and also having attempted to do so on another occasion), having (on several occasions when he was approximately 9 years old) performed

15

oral sex (as the active participant) on (and fondled the vagina of) his younger sister (who he indicated was, at the time, 3 years old), and having (as an adult) consumed [sic] incest-, bestiality-, and (simulated) violence-related pornography. Furthermore, Mr. Etheridge (who has been married on 3 different occasions, and indeed currently appears limited in his ability to engage in healthy, age-appropriate, interpersonal relationships) does appear to have a history of relationship instability, and sex offenders lacking in (healthy) social support have been shown to have higher levels of sexual recidivism. Finally, as indicated previously, Mr. Etheridge does appear to have a history of psychiatric impairment and symptomatology that has the potential to increase the likelihood of impulsive behavior and/or poor judgment.

ROA.480.

With respect to "relevant mitigating factors," the doctor noted that sex offenders who do not have prior sex offense convictions tend to have lower rates of sexual re-offense than those who have multiple sex offense convictions. ROA.480.

> 3.  Sentencing memoranda.

In his objections to the PSR, Etheridge sought a downward departure to level 43, based upon "coercion and duress" under U.S.S.G. § 5K2.12. ROA.77. Etheridge argued that he was "also a victim" because he was "physically and sexually abused by his father" between the ages of six and ten. ROA.77.

Defense counsel filed a lengthy sentencing memorandum, with letters from Etheridge's mother and two friends. ROA.499-529. In consideration of 18 U.S.C. § 3553(a)(1), the memorandum discussed Etheridge's history including, inter alia, absence of criminal history, incidents of self-harm, status as a 6th generation alcoholic, victim of sexual molestation by his father and his mother's friend. ROA.503-07. With respect to the nature and circumstances of the offense, the memorandum merely referenced the undisputed facts in the PSR. ROA.507; *see* § 3553(a)(1). With respect to the § 3553(a)(2) factors of seriousness of the offense, respect for the law, and just punishment, the memorandum provided extensive statistics on offenders who engaged in child sex offenses, noting that the majority involved child pornography offenses. ROA.507-12. Defense counsel noted that, "It is so easy to fall into the 'hysterics bandwagon' of this case due to the severity of the facts and circumstances" but requested the court's leniency. ROA.513.

In response to Etheridge's request for a downward departure for "coercion and duress," the prosecutor made two points in the Government's sentencing memorandum. ROA.494. First, the abuse by Etheridge's father occurred more than 30 years ago. ROA.494. Second,

Etheridge failed to explain how he was under any threat of physical harm or coercion when he videotaped himself sexually assaulting "E.E." and "K.C." ROA.494.

The prosecutor argued that Etheridge should not receive a lighter non-guideline sentence based upon the egregious nature and circumstances of the offense and the defendant's history and characteristics. ROA.494; *see* § 3553(a)(1). The prosecutor cited Etheridge's long and varied collection of child pornography dating back years before his instant arrest. ROA.494. Moreover, the prosecutor noted that Etheridge had begun producing his own child pornography videos with "K.C." and "E.E." two years before his arrest. ROA.495. Thus, although Etheridge had no prior arrests or convictions related to child sexual abuse, he had engaged in sexual abuse for years unapprehended. ROA.495. Further, Etheridge had recruited co-defendant Cronkhite to gain access to "K.C." ROA.495.

The prosecutor disagreed with Etheridge that the Guidelines overstated his culpability and that the range was "overly harsh." ROA.495. Etheridge not only sexually abused the children, but memorialized his abuse by creating videos and images. ROA.496.

Imposing a non-guideline sentence would result in a flagrant disregard for the impact of the abuse on four-year-old "E.E." and six-year-old "K.C." ROA.496. Based upon Etheridge's "overwhelming sexual interest in children," which he "repeatedly and continuously" acted upon, the prosecutor argued that Etheridge was very dangerous and his behavior warranted a guideline sentence of life imprisonment to achieve the goals of § 3553(a). ROA.497.

### 4.   Victim impact statements.

The United States sent victim impact forms to the parents of "K.C." (Mr. Cronkhite) and "E.E." (Ms. Trevino). The instructions asked the victims to identify the harm caused as a result of the offenses and any financial loss incurred. ROA.396. The instructions also informed the victims that any information they provided would be considered by the court toward the imposition of sentence and restitution. ROA.396. Only Ms. Trevino cooperated and completed a statement. ROA.396. Ms. Trevino reported that while both she and "E.E." had completed state-funded counseling with the "Children's Advocacy Center," neither were fully healed. ROA.396. As of July 2021, "E.E." had not made an outcry statement in counseling about the sexual abuse she sustained at the age

of four in 2020. ROA.396. "E.E.'s" counseling therefore "focused on body safety issues & coping mechanisms." ROA.396. Ms. Trevino documented "minimal" medical expenses. ROA.397. She did not know whether "E.E." remembered the assaults and did not know how the assaults would affect "E.E." in the future. ROA.399.

> 5.   The sentencing hearing.

At the start of the sentencing hearing, the district court stated that Dr. Thorne's report was "disturbing" in its conclusion that Etheridge had an "average" chance of reoffending, which the court deemed "more than a slight chance." ROA.276. The court assured the parties that he had read all submissions, including letters on Etheridge's behalf. ROA.278-81. Because Etheridge was far above the maximum guideline offense levels, any guideline-related issues would be purely academic. ROA.282-83. The court invited defense counsel to make mitigation arguments to support a § 3553(a) variance. ROA.283.

Defense counsel argued that Etheridge had sustained physical and sexual abuse in his youth. ROA.283. Defense counsel urged the court "not to be carried away" on an automatic life sentence and consider the

statistics offered in the sentencing memorandum regarding recidivism. ROA.287.

Judge Crane replied that the statistics defense counsel referred to in the sentencing memorandum related to child pornography. ROA.287. Etheridge's incestuous rapes of his four-year-old daughter "E.E." and sexual assaults on a six-year-old "K.C." were starkly different from child pornography cases: "most of these . . . were child porn cases and talking about child porn, but this is, in my estimate, dramatically worse. I mean, this is not child porn. This is - - I mean, he's raping his - - I mean, the victims." ROA.287. The court elaborated on the distinction between child pornography and incestuous rape:

> In a child porn case, often, I'll get these reports that the person has a fetish or a curiosity or – in observing the children in sexual acts but have never acted out. I get the reports saying 'not likely to act out on those.' 'This is somebody [sic] is just a voyeur.'
>
> And again, Mr. Etheridge, a completely different individual. He is someone who is a pedophile engaged in incestuous behavior, violent, repeatedly, multiple victims, again, over, I think, a significant period of time. We're all left to wonder if they were [sic] there were other victims that were antecedent to the discovery of these events, and I took a lot of interest in this evaluation of him. What's the expert going to say?

And I just put a lot of weight in that deciding, well, what's - - how do we protect future - - potential future victims from someone such as Mr. Etheridge?

* * *

It's hard to fathom, and really, there is - - the psychiatrist or psychologist doesn't really explain that, other than just to say, this is where he is, and then, does some evaluation, does some diagnostic testing and statistics are provided, and he ultimately says, "Look, I can't guarantee you that he's not going to do this again. In fact, I'd say he has an average change of reoffending.'

That's very concerning to the Court. I mean, this is just a horrible, horrible crime, and I am - - you used the words 'swept up.' I'm not swept up. The facts in this case are just so horrible, it is - - you are very concerned about protecting other children.

And again, this is somebody who - - and I'm not trying to make the Government's argument for them - - but this is somebody who groomed somebody else to give up their child, so that he could, then, have sexual interaction with another prepubescent child besides his own.

And again, it appeared to the Court, that unchecked, he would have gone to somebody else; and as you mentioned, untreated. If this mental disease that he suffers from, I mean, I have no doubt that there would have been future victims, and I worry that there were past victims also that haven't made a cry out. So again, I just put a lot of weight in what the psychologist says, and I'm just worried about that.

ROA.287-89. The court pointedly asked defense counsel whether he had correctly read Dr. Thorne's report:

THE COURT:  So obviously, one of the sentencing factors is to protect the public.  And so I looked at the evaluation that was done where, I believe, a large part of the evaluation was, is he somebody that is going to harm people in the future?  Does - - is this deviant sexual behavior something that is going to reappear?  *And so the psychologist, in focusing on that, says, 'I think, there is an average chance that that will happen,' is how I read the report.*  Again, I'm - -

DEFENSE COUNSEL:  He did - -

THE COURT:  *- - the door is open for you, though, to disagree or to suggest that it says something otherwise or point it out to me.*

DEFENSE COUNSEL:  He does say that, Your Honor, but he also says that all of this is based on an assumption.  I mean, based on the studies that he did.  And he also states, in conjunction with that that a large majority of adult sex offenders do not - -

THE COURT:  Uh-huh.

DEFENSE COUNSEL:  - - reoffend sexually.

ROA.290 (emphasis added).  Defense counsel never objected that the court:  1) misunderstood Etheridge's recidivism risk on the Static-99R to be "average," instead of a single-digit likelihood or 2) misunderstood that the Static-99R was contingent on Etheridge's release before age 60.  Defense counsel requested a 20 to 30 year sentence.  ROA.292.

Turning to restitution, the court advised Mr. Cronkhite, "K.C.'s" father, that restitution could be ordered for the victims upon request.

23

ROA.302-04.  Mr. Cronkhite never submitted a victim impact statement and therefore was unaware that restitution was an option.  ROA.303. The court explained that emotional trauma could manifest in "K.C.'s" teenage years, for which restitution would cover her medical treatment:

> I'm just speculating as to when you might have some emotional issues manifest but for the sake of discussion, let's suppose, during the teenage years, the victim starts to remember more, maybe there are some events that trigger her memory more and will need, I mean, have you considered they'll need - - this victim will need more intense therapy during those years, or some event causes her to remember this in a traumatic way?

ROA.303.  Mr. Cronkhite informed the court that he was displeased with his daughter's current psychologist and wanted a new doctor.  ROA.303. He had paid out-of-pocket for his daughter's visits to her psychologist. ROA.303.  The court explained that Mr. Cronkhite could be reimbursed for expenses incurred for past and future therapy, and that Mr. Cronkhite could give an estimate of his future expenses without mathematical precision.  ROA.304.  Mr. Cronkhite initially declined to give an estimate.  ROA.304.  The court explained that Etheridge had available funds that would not benefit the victims unless some estimate of loss was given.  ROA.304.  The court stated, "I mean, this is your chance to help the victim here.  I mean, I know you're reluctant, but - - "

24

ROA.304. Mr. Cronkhite estimated that he had spent $2,000 to date on mental health fees for "K.C." ROA.305. The court inquired whether Mr. Cronkhite estimated a similar expense of $1,000 a year over the next five or six years or into her teenage years. ROA.303, 305. Mr. Cronkhite agreed that that was a reasonable estimate. ROA.306.

Ms. Trevino, the mother of Etheridge's four-year-old daughter "E.E." whom Etheridge had raped, also spoke about restitution. ROA.309. Although she had received free treatment for her daughter to date, she 'fear[ed] . . . that there may be expenses in the future." ROA.309. She and "E.E." were still living in the house where the rapes occurred. ROA.310. "E.E." recalled some of the encounters with Etheridge. ROA.311. As soon as "E.E." started to talk about them, she would stop and say, "Oh, I shouldn't talk about this." ROA.311. The court believed from the videos and physical descriptions of the two rapes that four-year-old "E.E." had been physically injured and asked whether the child had received medical care. ROA.311. Ms. Trevino responded that the exam did not reveal any physical injuries. ROA.311. In response to the court's question about therapy expenses that might manifest later

because of "E.E's" young age, Ms. Trevino stated that she had concerns for future therapy.  ROA.312.

The prosecutor stressed that while this was Etheridge's first prosecuted offense, it involved two victims and was "a continuous act over the course of a long period of time."  ROA.314.  In addition to the physical abuse committed by Etheridge, he had collected hundreds of videos and files of child pornography, confirming his obsessive interest in the children.  ROA.314.  Further, the prosecutor emphasized that Etheridge videotaped the abhorrent sexual assaults against the children in order to "memorialize[] them" and "relive it."  ROA.314-15.  For this reason, the prosecutor concluded that Etheridge was extremely dangerous in his desire to keep reoffending with his own victims by videotaping the assaults.  ROA.315.  The prosecutor requested life imprisonment to protect any future child victims.  ROA.315.

Prior to pronouncing sentence the court explained this case was rare because it involved incestuous pedophilia:

> I've been watching this case since its inception because of its seriousness and very unusual nature.  It's very rare that I see incestuous pedophilia; and although I have seen in other cases in criminal history of Defendants, but it is extremely unusual, and just given the really violent and horrible acts that were videotaped in this case, I am very concerned about a fair

sentence; and therefore, I've made sure that we had psychological evaluations, I gave lots of time to anybody - - any side that wanted to submit additional materials, and I've carefully reviewed all of them.

I have reset the sentencing hearing multiple times because I wanted to leave no stone unturned given how serious this was, but I'm still convinced that the sentence I'm going to pronounce is the fair one. It's what I arrived at when I - - in preparing for today, but was open-minded to anything that might occur here before making an ultimate decision.

ROA.318.

The court remarked that the PSR was correctly scored at level 43, recommending a life sentence. ROA.318. Judge Crane pronounced a life sentence in consideration of "all of the 3553(a) factors, which again, I have considered very closely, I feel as though that guideline sentence is a fair one here largely because of my concern and fear that Mr. Etheridge is going to reoffend." ROA.318. The court elaborated on the nature Etheridge's horrific acts of abuse and his personal characteristics:

The behavior is so horrific, and the mind has to be so deranged that I don't think therapy is going to cure Mr. Etheridge or prevent him from having these fantasies about molesting children. I don't think he can ever be trusted in the presence of children.

Mr. Etheridge is very smart, and I believe, having read the text interchanges between him and Ms. Cronkhite, that he was very calculating in grooming her to allow her child to be victimized, and then, when he was done with Ms. Cronkhite,

27

> my belief is that his intent was to move on to someone else. And so therefore, I believe the life sentence is appropriate. So Mr. Etheridge is committed to the BOP for a term of life.

ROA.318-19.  In the event of Etheridge's release, the court imposed a life term of supervised release and other conditions restricting contact with minors.  ROA.319.

With respect to restitution for "K.C.," for whom Mr. Cronkhite spoke, the court ordered $2,000 in past restitution and $10,000 for future restitution, for a total of $12,000 to be paid immediately.  ROA.197, 320. The court concluded that "E.E." would need similar care based upon the statements made on behalf of "K.C."  ROA.320.  Therefore, the court ordered $10,000 in restitution for "E.E.'s" future therapy to be paid immediately.  ROA.198, 320.  The judgment reflected a total loss of $12,000 to "K.C." and $10,000 for "E.E." with the corresponding restitution awards.  ROA.197-98.

The court imposed 360 months of imprisonment on Counts One and Two to run concurrently with each other and concurrently with life imprisonment on Count Three.  ROA.194, 321.

## SUMMARY OF THE ARGUMENT

I.    For the first time on appeal, Etheridge argues that his sentence is procedurally and substantively unreasonable because the district court misunderstood the Static-99R assessment in two ways. First, he claims that the district court misunderstood Etheridge had a "average" chance of recidivism, instead of a single-digit likelihood. Second, he asserts that the district court misunderstood that the "average" rating was premised upon a release date before the age of 60. The district judge made clear that he had read Dr. Thorne's entire report. No evidence exists in the record that the district court misunderstood the Static-99R portion of Dr. Thorne's report.  Etheridge's unsupported and conclusory allegations are insufficient to satisfy the first two prongs of plain-error review.

In any event, Etheridge cannot demonstrate that his substantial rights were affected even if the district court somehow misapprehended the Static-99R results.  The doctor administered other assessments, the RSVP and the "research-based factors," in which he expressed serious concerns for Etheridge's recidivism risk.  Those included, inter alia, a history of bestiality, sexual abuse of Etheridge's three-year-old sister on

multiple occasions, relationship instability, and selection of an extrafamilial victim in "K.C." The district court properly exercised its discretion to credit the areas of concern in the doctor's report.

Even under the last prong of plain-error, Etheridge cannot make a persuasive argument. The Static-99R related to only one sentencing factor — protection of the public under § 3553(a)(2)(C). The district court equally considered the § 3553(a)(1) factors of nature of the offense and Etheridge's characteristics. Defense counsel urged the court not to get "carried away" by the facts of the case and offered child pornography recidivism statistics. The court distinguished Etheridge's videotaped incestuous rape of four-year-old "E.E." and sexual assault of six-year-old "K.C." from voyeurs of child pornography. The court emphasized that the facts of Etheridge's offense were incestuous, violent, consistent, and recorded. He also groomed Cronkhite to offer up her own child for his sexually deviant acts.

While Etheridge had no prior convictions, he had admitted to past bestiality, sexual assault of his three-year-old sister, and maintenance of a child pornography collection. Etheridge's life sentence is commensurate with other life sentences imposed on similar facts. Under

plain-review, his challenge to the court's interpretation of the Static-99R assessment fails.

II.    The district court properly assessed restitution of $12,000 for "K.C." and $10,000 for "E.E."  "K.C.'s" father testified that he had spent $1,000 for the past two years on "K.C.'s" therapy because of Etheridge's sexual assaults.  Mr. Cronkhite believed that he would spend the same sum each year into "K.C.'s" teenage years.  The district court properly exercised its discretion in crediting this testimony and in awarding $2,000 in restitution for past therapy expenses and $10,000 for future expenses.  No error, plain or otherwise, exists in the restitution award.

Ms. Trevino's victim impact statement explained that both she and "E.E." had received past state-funded therapy for Etheridge's rapes of their daughter.  In her written statement and in her testimony at sentencing, she feared incurring future therapy expenses because her daughter, aged five around the time of sentencing, had not yet made an outcry statement and was not emotionally healed.  Fashioning a reasonable estimate based upon the similar kind of harm imposed upon "K.C." and her therapy expenses, the court arrived at a sum of $10,000 in future therapy expenses for "E.E."  The district court did not

arbitrarily choose that amount.  Rather, the court's calculation was consistent with "K.C.'s" award and similar restitution awards for future therapy for sexually exploited children.

Should this Court disagree that the evidence is insufficient to sustain the restitution award for "E.E.," precedence requires remand for the court to consider supplemental evidence of her future therapy expenses.  The district court properly credited Ms. Trevino's testimony that "E.E." had received past therapy and that future therapy was anticipated.  Under similar circumstances, this Court has rejected the invitation to zero-out a restitution award and harm the child victim.  It should do so here as well if it does not affirm the restitution order.

## ARGUMENT

### I.

The sentence of life imprisonment is procedurally and substantively reasonable under plain-error review.

### A.    Plain-error review.

A reasonableness review of a sentence is a bifurcated process.  *Gall v. United States,* 552 U.S. 38, 51 (2007).  At the first step, this Court considers whether the district court committed "significant procedural error," such as the erroneous assessment of evidence.  *See United States*

*v. Castillo,* 430 F.3d 230, 238-39, 243-44 (5th Cir. 2005). If there is no significant procedural error, this Court proceeds to the second step under the *Gall* analysis and considers the substantive reasonableness of a sentence. *Gall,* 552 U.S. at 51. A within-Guidelines sentence, as here, is presumptively reasonable. *See United States v. Vargas*, 21 F.4th 332, 337 (5th Cir. 2021) (citation omitted). To rebut the presumption, Etheridge must show that his sentence fails: (1) to account for a factor that should have received significant weight; (2) gives significant weight to an irrelevant or improper factor; or (3) represents a clear error of judgment in balancing the 18 U.S.C. § 3553(a) sentencing factors. *See id.*

Where a defendant fails to assert a procedural error, review is for plain error. *United States v. Coto-Mendoza,* 986 F.3d 583, 585 (5th Cir.), *cert. denied,* 142 S. Ct. 207 (2021) (citing *Molina-Martinez v. United States,* 578 U.S. 189, 194 (2016)); *United States v. Whitelaw,* 580 F.3d 256, 259 (5th Cir. 2009); *United States v. Jones,* No. 21-10916, 2022 WL 807997 at *1 (5th Cir. 2022) (unpublished)[5].

---

[5]    Unpublished cases from this Circuit after January 1996 are not controlling precedent but may be considered as persuasive authority. *Ballard v. Burton*, 444 F.3d 391, 401 & n.7 (5th Cir. 2006); 5th Cir. R. 47.5.4.

Etheridge acknowledges that he did not specifically object to a procedural error but nonetheless argues that his argument is preserved under *Holguin-Hernandez v. United States,* __ U.S. __ , 140 S. Ct. 762 (2020), because he requested a lesser sentence.  Appellant's Brief, 24.  This Court rejected Etheridge's preservation argument in *Coto-Mendoza,* where the defendant argued on appeal that the sentence was procedurally unreasonable because the district court failed to explain its sentence.  986 F.3d at 588.  Conceding that he had failed to object, Coto-Mendoza argued that no separate objection was necessary to preserve his procedural-reasonableness challenge under *Holguin-Hernandez.*

In *Holguin-Hernandez,* the Supreme Court held that to preserve a substantive reasonableness challenge, it was sufficient to communicate a specific sentence or to argue that a sentence was "greater than necessary."  *Id.* at 766-67.  The Supreme Court specifically declined to decide "what is sufficient to preserve a claim that a trial court used improper *procedures* in arriving at its chosen sentence."  *See Coto-Mendoza,* 986 F.3d at 586 (quoting *Holguin-Hernandez,* 140 S. Ct. at 767 (opinion), 767 (Alito, J., concurring).  This Court thus refused to extend the holding in *Holguin-Hernandez* to Coto-Mendoza's procedural-

34

reasonableness challenge and reviewed the issue under plain-error review. *Id.* at 586. It should do the same here.

This Court should also reject Etheridge's claim that by contesting the length of his sentence generally, he preserved a specific substantive reasonableness challenge to the district court's interpretation of the Static99-R results in Dr. Thorne's report. This Court previously did just that in *United States v. Zarco-Beiza,* 24 F.4th 477, 481-82 (5th Cir. 2022), where the defendant argued that his general objection to the substantive reasonableness of the sentence preserved a more specific substantive-reasonableness objection on appeal. Under *Holguin-Hernandez,* Zarco-Beiza argued that he could assert for the first time on appeal that his sentence was substantively unreasonable because the court improperly relied upon a bare arrest record. *Id.* at 480-82. The Supreme Court did not decide what is sufficient to preserve precise substantive-reasonableness arguments, such that a generalized argument in favor of a lesser sentence would insulate "*all* arguments regarding the length of a sentence from plain-error review." *Id.* at 481 (citing *Holguin-Hernandez,* 140 S. Ct. at 767 (Alito, J., concurring)). The touchstone of preservation under *Holguin-Hernandez,* is whether the claimed error

was "brought to the court's attention." *Id.* (citing *Holguin-Hernandez,* 140 S. Ct. at 766). Zarco-Beiza's failure to object to the court's consideration of a bare arrest record resulted in plain-error review of his substantive-reasonableness argument. *Id.* at 481-82.

This Court has long emphasized the importance of vetting specific legal arguments below for the district court to consider in the first instance:

> The purpose of plain error review is to instill in litigators the importance of preparing adequately before appearing in trial court and, as necessary, clarifying issues to that court. Timely, adequate objections allow the trial court to rule in the first instance and if necessary, correct itself without spawning an appeal. This standard usually shields the district court from reversal because of error that was unwittingly committed, because not brought to its attention. The standard also shields this court from ruling on issues that have been insufficiently vetted below. Plain error review implicitly acknowledges that, in many cases, an appeal represents the triumph of hindsight, as a party attempts to shore up objections ineffectively lodged in the trial court, or not lodged at all, by adducing after-the-fact support for its position. Thus, to afford the standard of harmless error, FED. R. CRIM. P. 52(a), to a defendant who makes a vague objection in the trial court, followed by a substantial and specific legal brief in the appellate court, would undermine the orderliness intended by these tiered standards.

*United States v. Chavez-Hernandez,* 671 F.3d 494, 497 (5th Cir. 2012).

Here, Etheridge's challenges to the reasonableness of his sentence are reviewed for plain error only. *See Zarco-Beiza,* 24 F.4th at 481-82; *Coto-Mendoza,* 986 F.3d at 585-86. For the first time on appeal, Etheridge argues that his sentence was procedurally and substantively unreasonable because the district court misunderstood Dr. Thorne's conclusions on the Static-99R, one of the risk assessments used to evaluate recidivism. First, according to Etheridge, the court misunderstood that Etheridge had an "average" chance of recidivism on the Static-99R, instead of a single-digit likelihood. Appellant's Brief, 23. And second, the court allegedly misunderstood that Dr. Thorne's conclusions on the Static-99R were premised upon Etheridge's release date before the age of 60. Appellant's Brief, 23, 29-30.

Neither of these claims were brought to the district court's attention, as required by *Holguin-Hernandez,* despite the district court *expressly inviting* Etheridge to do so at sentencing. *See Zarco-Beiza,* 24 F.4th at 481 (citing *Holguin-Hernandez,* 140 S. Ct. at 766 (quoting Fed. R. Crim. P. 52 (b)). Judge Crane announced that he had read Dr. Thorne's entire report and understood Etheridge had "average" chance of recidivism. ROA.290. The district court then informed defense counsel

that the "door was open for you though, to disagree or to suggest that it says something otherwise or point it out to me." ROA.290. Etheridge waived his procedural and substantive reasonableness challenges to the court's interpretation of Dr. Thorne's conclusions on the Static-99R. *See United States v. Cabello,* 33 F.4th 281, 295 (5th Cir. 2022) (citing *United States v. Olano,* 507 U.S. 725, 732 (1993)). Assuming the issue is not waived, Etheridge must show 1) error, 2) that is clear and obvious, 3) that affects his substantial rights, and 4) that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceeding." *See Zarco-Beiza,* 24 F.4th at 482 (citation omitted).

## B. Zero evidence exists that the district court misunderstood Dr. Thorne's report.

In his "Summary and Opinions" Dr. Thorne concluded that Etheridge's "+1" score on the Static-99R placed him in the "Average" category for recidivism. ROA.478, 481. Dr. Thorne explained that those who fall into the "Average" category have predicted recidivism rates of 2.7% to 3.7% for 5-years to 3.9% to 6.7% for 10-years. ROA.478. Texas sex offenders with a "+1" score rated between 1.4% and 2.6% for recidivism within 5 years. ROA.479. Dr. Thorne noted that the "Average" category was based upon the assumption that Etheridge could

be released into the community before his 60th birthday.  ROA.478.

During the sentencing hearing, the court confirmed that he had read Dr. Thorne's report in full.  ROA.275-76.  Etheridge states that the court viewed "Average" as "50/50," Appellant's Brief, 21, but fails to give any record citation for this statement.  Nor does he cite where the court allegedly misunderstood the "Average" rating or the age-related release assumption.  Etheridge's reasonableness challenges are unsupported. Unsupported and speculative arguments do not establish reversible plain error.  *See United States v. Guzman-Reyes,* 853 F.3d 260, 266 (5th Cir. 2017) (citation omitted).  The unpublished cases cited by Etheridge are distinguishable because none of them involved unsupported speculation. *See United States v. Maldonado,* 726 F. App'x 263, 264 (5th Cir. 2018) (government concession to wrong number of prior deportations); *United States v. Hatley,* 717 F. App'x 457, 465-66 (5th Cir. 2018) (district court erroneously recalled that defendant had testified at another trial); *United States v. Jimenez-Espinoza,* 408 F. App'x 823, 824-25 (5th Cir. 2011) (no evidence of profit to support smuggling enhancement); *United States v. Cruz-Pallares,* 396 F. App'x 170, 172 (5th Cir. 2010) (error in deportation date); *United States v. Sanchez,* 277 F. App'x 494, 496-97 (5th Cir. 2008)

(no evidence of multiple conspiracy or participation in lesser conspiracy); *United States v. Guidry,* 462 F.3d 373, 376-78 (5th Cir. 2006), *overruled on other grounds as noted in United States v. Warfield,* 283 F. App'x 234, 235 (5th Cir. 2008) (district court misread facts in the PSR related to criminal history).  The plain-error analysis ends at the first and second prongs of review.

For the sake of completeness, Etheridge fails to demonstrate the remaining prongs of plain error.  He isolates the Static-99R assessment without considering the doctor's other conclusions on the RSVP assessment or on the "research-based risk factors."  While the doctor rated Etheridge as "moderate" for recidivism on the RSVP, the doctor concomitantly highlighted six areas of recidivism concern including, inter alia, alcohol abuse, relationship instability, limited coping skills, history of sexual abuse, lack of insight into personal functioning, and continuous sexual deviancy.  ROA.478.

With respect to "research-based risk factors," the doctor noted that an offender's selection of extrafamilial victims represented a higher risk of recidivism.  ROA.480.  "K.C." was an extrafamilial victim.  Despite the absence of documented child sex offenses, via convictions or arrests, the

doctor highlighted other concerns. Etheridge admitted to committing deviant and sadistic acts. ROA.480. Etheridge had inserted his penis in a female dog's vagina on two occasions, once as a teenager and at another undisclosed time. ROA.480. He had performed oral sex on his three-year-old sister on several occasions when he was nine years old. ROA.480. He had fondled his three-year-old sister's vagina on several occasions. ROA.480. Etheridge had watched incest, bestiality, and violence-related pornography. ROA.480. Other factors that heightened the doctor's concern for recidivism included: Etheridge's limited ability to engage in healthy, stable, age-appropriate, interpersonal relationships as evidenced by his three failed marriages, and a history of psychiatric impairment. ROA.480. The district court properly exercised its discretion to decide what portions of the report to credit at sentencing. *See United States v. Cantu-Ramirez,* 669 F.3d 619, 628 (5th Cir. 2012).

Moreover, Dr. Thorne's report addressed only one sentencing factor, "protection of the public" under § 3553(a)(2)(C). The court announced that it had considered "all of the 3553(a) factors." ROA.318. Judge Crane's comments confirmed that the nature and circumstances of the offense and Etheridge's characteristics under § 3553(a)(1) justified the

life sentence as much as the recidivism risk under § 3553(a)(2)(C).

Under the "nature and circumstances of the offense," the court distinguished Etheridge's acts from those of voyeurs who collected child pornography. ROA.289. For nearly two years, Etheridge engaged in incestuous rape of his own four-year old daughter and groomed Cronkhite to give up her own six-year-old daughter for Etheridge's assaults — all of which he personally videotaped. ROA.289.

Under Etheridge's characteristics, the district court noted that while Etheridge had not been previously convicted, he had engaged in past illegal activity for a continuous period of time before he was finally caught. Etheridge had admitted to bestiality, sexual assault of his sister when she was three, and to keeping many child pornography files on his computer. ROA.480.

These § 3553(a) considerations were distinct from Dr. Thorne's report and justified the court's sentence of life imprisonment. Before pronouncing its sentence, the court stressed that the facts of the offense were "extremely unusual," "horrific," and "really violent and horrible acts" that Etheridge had committed and videotaped. ROA.318. The court rightly considered and weighted Dr. Thorne's report and took that into

consideration *with* the egregious facts of the offense. Under these circumstances, Etheridge cannot establish that his substantial rights were affected or that the fairness of the proceedings were compromised. Etheridge disagrees with how the district court weighed the § 3553(a) factors, which is insufficient to prevail on plain-error challenge to the reasonableness of his sentence. *See United States v. Alvarado,* 691 F.3d 592, 597 (5th Cir. 2012).

Etheridge knew he faced a life sentence when he pleaded guilty. Life sentences are not uncommon for defendants who commit egregious sexual crimes against children, as here. *See United States v. Trader,* 981 F.3d 961, 970 (11th Cir. 2020) (affirming life sentence for defendant who repeatedly sexually abused his daughters, recorded the incidents, encouraged others to abuse their own daughters, and possessed a cache of the most disturbing child pornography the prosecutor and case agent had ever seen); *United States v. Sanchez,* No. 22-40133, 2022 WL 17250178 at *1 (5th Cir. 2022) (unpublished); *United States v. McLaughlin,* 847 F. App'x 573, 574-76 (11th Cir.), *cert. denied,* 142 S. Ct. 222 (2021) (unpublished); *United States v. Vickers,* 683 F. App'x 393, 398-99 (6th Cir. 2017) (unpublished); *United States v. Wares,* 689 F. App'x

43

719, 724 (3d Cir. 2017) (unpublished). Accordingly, Etheridge's within-Guidelines life sentence is reasonable under plain-error review.

## II.

The district court did not plainly err in awarding $12,000 in restitution for "K.C." and $10,000 in restitution for "E.E."

### A.    Standard of review.

As he correctly concedes (Appellant's Brief, 39), Etheridge's failure to challenge the amount of restitution for "K.C." and "E.E." results in plain-error review. *See United States v. Leal,* 933 F.3d 426, 431-32 (5th Cir. 2019) (reviewing restitution award for child pornography offenses under 18 U.S.C. § 2259 for plain error). Etheridge must demonstrate that the restitution awards amounted to error, that is clear and obvious and that affected his substantial rights. *See Leal,* 933 F.3d at 431. If these three conditions are met, this Court may choose to exercise its discretion and correct the error if it "seriously affects the fairness, integrity or public reputation of the proceedings." *Id.* Even under an abuse of discretion standard, the restitution award is proper in this case. *See Sanchez,* at 2022 WL 17250178 at *1 (5th Cir. 2022) (unpublished) (citing *United States v. Villalobos,* 879 F.3d 169, 171 (5th Cir. 2018)).

**B.     Title 18 U.S.C. §§ 2259 & 2429 authorized restitution for "K.C." and "E.E."**

"A district court may order restitution only if authorized by statute." *See United States v. Penn,* 969 F.3d 450, 458 (5th Cir. 2020).

1.     Title 18 U.S.C. § 2259.

Title 18 U.S.C. § 2259 authorized mandatory restitution for "K.C" and "E.E."  Section 2259(a) provides that "a district court 'shall order restitution for any offense' under Chapter 110 of Title 18."  *Paroline v. United States,* 572 U.S. 434, 443 (2014).  This covers Etheridge's offenses and convictions for production of child pornography in Count One ("K.C.") and in Count Two ("E.E."), violations of 18 U.S.C. § 2251(a).  ROA.39-40, 166.  Mandatory restitution under § 2259 is proper "only to the extent [Etheridge's] offense proximately caused a victim's losses." *Paroline,* 572 U.S. at 448.  There is no dispute that Etheridge's offenses proximately caused all of "K.C." and "E.E.'s" losses — the dispute centers on what those findings are and what evidence supports the district court's findings.

Section 2259 provides that "[t]he court shall determine the full amount of the victim's loss that were incurred *or are reasonably projected to be incurred by the victim* as a result of trafficking in child pornography

45

depicting the victim." § 2259(b)(2)(A).  The "full amount of the victim's loss" includes "any costs incurred, *or that are reasonably projected to be incurred in the future, by a victim,* as the proximate result of all trafficking in child pornography offenses involving the same victim." § 2259(c)(2) (emphasis added).  Section 2259 sets a minimum restitution of $3,000 per victim. § 2259(b)(2)(B).  The victim's losses include "medical services relating to physical, psychiatric, or psychological services," "rehabilitation," and "any other losses suffered by the victim as a proximate result of the offense."  18 U.S.C. § 2259(c)(2)(A), (B), and (F); *see United States v. Clemens,* 990 F.3d 1127, 1130 (8th Cir. 2021); *Leal,* 933 F.3d at 433; *United States v. Jones*, 815 F. App'x 870, 882 (6th Cir. 2020) (unpublished); *United States v. Mobasseri,* 828 F. App'x 278, 280 (6th Cir. 2020) (unpublished).  "Victim" is defined as an individual harmed as a result of the crime and includes the legal guardians of minor victims.  §§ 2259(c)(4), 2429(d).

The district court assessed a loss of $12,000 to "K.C."— $2,000 for past therapy expenses and $10,000 for future therapy expenses, to include her teenage years.  ROA.197, 303, 305-06, 319-20.  The court imposed a commensurate $12,000 restitution award.  ROA.197.  The

court assessed a loss of $10,00 to "E.E." for future therapy expenses and imposed a $10,000 restitution award.  ROA.198, 308, 311-12, 320.

  2. <u>Title 18 U.S.C. § 2429.</u>

 Etheridge also pleaded guilty to Count Three for knowingly and intentionally coercing or enticing a minor to engage in any sexual activity, in violation of 18 U.S.C. § 2422(b).  ROA.40.  Title 18 U.S.C. § 2429, provides mandatory restitution for § 2422(b) offenses, notwithstanding the general restitution statutes of 18 U.S.C. §§ 3663 or 3663A.  18 U.S.C. § 2429(a).

 Subsection (b)(1) of § 2429 provides that the "order of restitution … shall direct the defendant to pay the victim (through the appropriate court mechanism, the full amount of the victim's losses as determined by the court under paragraph (3)."  As written, subsection (b)(3) provides: "As used in this subsection, the term 'full amount of the victim's losses' has the same meaning as provided in section 2259<u>(b)(3)</u>.'"  § 2429(b)(3) (emphasis added).  In *United States v. Kempter*, 29 F.4th 960, 969-70 (8th Cir. 2022), the Eighth Circuit explained the reference to 2259(b)(3)—*i.e.,* the "enforcement provision" in § 2259—as a scrivener's error.  Upon review of the relevant portions of both statutes and the corresponding

47

legislative history, the Eighth Circuit concluded that the only reasonable construction of § 2429(b)(3) was a cross-reference to § 2259(c)(2)—the statutory provision in § 2259 defining the "full amounts of victim's losses" as "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate cause of the offenses involving the victims." *Kempter,* 29 F.4th at 969-70. For purposes of applying § 2429(b)(1), the Eighth Circuit found "no plausible purpose" of § 2259(b)(3) when read holistically with the rest of the statute and "no plausible explanation" as to why § 2429(b) would cite to § 2259(b)(3) other than Congress failed to update the cross reference. *Id.*; *cf.,* 18 U.S.C. § 1593(b)(3) (mandatory restitution provision correctly cross-referencing to § 2259(c)(2)). This Court has adopted the approach in *Kempter* that the cross-reference to § 2259(b)(3) instead of § 2259(c)(2) is merely a scrivener's error. *Sanchez,* 2002 WL 17250178 at *1. Etheridge does not mention *Sanchez.* Appellant's Brief, 43, n.8.

Finally, § 2429(b)(2), like § 2259(a), provides that "an order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A," 18 U.S.C. § 2429(b)(2). The Government's burden under 18 U.S.C.

§ 3664(e) is to provide the court with enough evidence to allow the court to estimate the "full amount of the victim's losses" with "some reasonable certainty" by a preponderance of the evidence. *United States v. Kennedy*, 643 F.3d 1251, 1261 (9th Cir. 2011); *United States v. Doe*, 488 F.3d 1154, 1159-60 (9th Cir. 2007); *United States v. Reese,* 998 F.2d 1275, 1282 (5th Cir. 1993). "Absolute precision' is not required" when calculating the amount of loss. *United States v. Kearney,* 672 F.3d 81, 100 (1st Cir. 2012); *United States v. Reasor,* 541 F.3d 366, 369 (5th Cir. 2008). The district court may rely on the Government's reasonable approximation of loss and may accept estimates of loss when precision is not possible. *United States v. Futrell*, 209 F.3d 1286, 1292 (11th Cir. 2000). Plus, this Court "need not determine whether the district court's estimate was the most reasonable, but rather only that it is a reasonable calculation." *United States v. Hebron,* 684 F.3d 554, 564 (5th Cir. 2012).

## C.    No error that is clear and obvious exists with the restitution awards.

This Court has recognized that it is not unusual for parents of child victims of sexual abuse crimes to be so traumatized they cannot orally advocate for restitution at sentencing. In *Villalobos,* 879 F.3d at 171, the defendant induced his 11-year-old daughter to take sexually explicit

photographs of herself and send them to him via Facebook Messenger. *Id.* His daughter attended therapy sessions that required the victim's mother to miss work. *Id.* The victim's mother did not report any dollar amounts or documents supporting loss. *Id.* Although the court gave the victim's mother an opportunity to speak about her losses for restitution, she was "unable to speak once she reached the witness stand." *Id.* The prosecutor did not identify any specific loss amounts and the district court imposed $10,000 in restitution. *Id.* The court acknowledged that without documentation or support of any of the victim's incurred costs, the court was "swinging a little bit blindly" on the restitution amount. *Id.* Villalobos objected that the award was arbitrary and unsupported by the record evidence. *Id.* He requested that restitution award be vacated entirely on remand. *Id.* This Court sided with the United States and agreed that upon remand, the victims could provide supplementation to support their lost wages, travel costs, and therapy expenses. *Id.* at 172.

Under the general rule in *United States v. Chem. & Metal Indus., Inc.,* 677 F.3d 750, 752 (5th Cir. 2012), the prosecution may not present new evidence to support restitution on remand where it failed to do so in the first instance. However, in *Villalobos,* this Court applied one of the

recognized exceptions to the general rule. 879 F.3d at 172. That is, this Court held that "special circumstances" existed to explain why the evidence was unavailable. *Id.* The victim's mother's "inability to speak at sentencing" fell within the exception. *Id.* This Court declined to impose further harm on the victims and permitted the district court on remand to consider supplemental evidence to support restitution. *Id.*

Other courts have recognized that "the resources often available to the parties and the Court in a full-blown trial are simply not available in this type of criminal proceeding." *United States v. Baker*, 672 F. Supp. 2d 771, 777 (E.D. Tex. 2009).

> Moreover, [ ] victims of these horrific sexual crimes often lack the financial resources to obtain counsel and experts to put forth fulsome proof of their current and future losses. The statute, however, mandates that the defendant pay the "full amount" of "any costs...for physical, psychiatric, or psychological care." 18 U.S.C. § 2259(b). Additionally, the Sixth Circuit and other circuits have recognized that "[s]ection 2259 is phrased in generous terms, in order to compensate the victims of sexual abuse for the care required to address the long term effects of their abuse." *United States v. Evers*, 669 F.3d 645, 656 (6th Cir. 2012) (quoting *United States v. Laney*, 189 F.3d 954, 966 (9th Cir. 1999)).

*United States v. DeHate*, 2016 WL 3549349, at *6 (E.D. Mich. June 30, 2016) (quoting *United States v. Miller*, 2015 WL 6689363 (E.D. Mich. 2015)).

1.    <u>The $12,000 restitution award for six-year-old "K.C."</u>

Here, Mr. Cronkhite, K.C.'s father, did not provide the United States with a victim impact statement to support any losses that six-year-old "K.C." had sustained. *See Villalobos,* 879 F.3d at 171. At sentencing, he initially declined to speak. ROA.303-04. Given the egregious nature of Etheridge's sexual abuse of six-year-old "K.C.," Mr. Cronkhite's initial reluctance to speak about "K.C.'s" trauma in open court was not unusual. *See Villalobos,* 879 F.3d at 170. Unlike the victim's mother in *Villalobos,* Mr. Cronkhite was eventually able to discuss the costs he had incurred for "K.C.'s" past therapy. ROA.303-05. Over the course of the past two years, Mr. Cronkhite testified that had spent approximately $2,000 in out-of-pocket therapy for "K.C." ROA.305. Mr. Cronkhite estimated that he would spend the same, approximately $1,000 per year, for at least the next six years or through her teenage years (approximately 10 more years). ROA.303, 305-06. The court properly credited Mr. Cronkhite's testimony at sentencing. *See Reese,* 998 F.2d at 1282.

Etheridge discounts "K.C.'s" future therapy costs because Mr. Cronkhite wanted to find a new psychologist for "K.C." Under these circumstances, Etheridge argues that the future therapy costs become

speculative. Appellant's Brief, 47. But the restitution statutes do not require absolute precision. *See Reasor,* 541 F.3d at 369. This is especially true in the context of calculating future therapy costs for minor victims of sex crimes. *See Doe,* 488 F.3d at 1159 (recognizing that every circuit to consider the causation requirement of § 2259 applies a rule of reasonableness to the district court's estimation of the victim's loss). Consequently, courts allow "a district court significant discretion to make a reasonable estimate of an amount that reflects the full loss to the victim." *Id.* at 1160 (citing *United States v. Danser,* 270 F.3d 451, 455 (7th Cir. 2001) and *United States v. Julian,* 242 F.3d 1245, 1247 (10th Cir. 2001)). Such estimates reflect the "strong Congressional intent behind section 2259," which is to allow the victims of child sexual abuse crimes to receive the counseling and treatment that they require. *Danser,* 270 F.3d at 455; *Laney,* 189 F.3d at 967 ("[I]f Congress intended crime victims who required long-term psychological or physical therapy to receive restitution only after they actually paid their therapists, it created a strangely unwieldy procedure in Section 3664, which would require a victim to petition the court for an amended restitution order every 60 days for as long as the therapy lasted."). By

including future payments for therapy, "Congress was well aware that children victimized by sexual abuse often do not recover quickly from their injuries." *Laney,* 189 F.3d at 966.

The district court reasonably estimated that future therapy expenses would be $1,000 per year based upon two years of therapy costing $2,000. It was reasonable to anticipate similar expenses even using a different therapist. Moreover, the district court's estimate was conservative — it used the same total of $1000 each year, not accounting for the reality that therapy costs will most likely increase with time. *See Danser,* 270 F.3d at 455-56 & n.6.

In *Danser,* the defendant was convicted on three counts of sexual abuse arising from a sexual relationship with his nine-year-old daughter. *Id.* at 452. At the sentencing hearing, the child's therapist testified that she would require long-term mental health care, possibly for the rest of her life. *Id.* The prosecution provided a restitution amount of $309,270 for therapy, of which $304,200 comprised future therapy costs. *Id.* Under plain-error review, Danser argued that insufficient evidence supported lifetime counseling where the costs were unascertainable. *Id.* The Seventh Circuit held that no clear and obvious error existed when the

figures were proffered by the treating psychologist and the district court simply multiplied the present value of therapy to determine future costs. *Id.* at 456 & n.6. The Court noted that the district judge "did not take into account that the costs of therapy might well (and, indeed most probably will) increase with time. In this respect, the dangers associated with projecting costs were certainly diminished." *Id.*

The total restitution award here of $22,000 for the two victims at $1,000 per year is low by comparison to *Danser* and other cases using estimates for minors' therapy costs. *See Doe,* 488 F.3d at 1161 (noting that two years of counseling at $1,426 per child was low in comparison to $304,200 lifetime counseling costs in *Danser*.); *see also United States v. Johnson,* 680 F. App'x 194, 200-01 (4th Cir. Feb. 28, 2017) (unpublished) (finding it "reasonable to base restitution calculation [$78,000 for future therapy costs] on weekly sessions with an identified therapist for the next ten years, until the child reaches the age of eighteen (and without any consideration for the likelihood that such costs will increase by then)").

The record establishes that the court's restitution calculation was based upon testimony of "K.C.'s" past therapy expenses and upon a reasonable approximation of "K.C.'s" future therapy. *See Reese,* 998 F.2d

at 2282; *Villalobos,* 879 F.3d at 172; *Futrell,* 209 F.3d at 1292.  No clear

and obvious error exists in the $12,000 restitution award for "K.C."  *See*

*Danser,* 270 F.3d at 456.

> 2.    The $10,000 restitution award for "E.E."

Ms. Trevino's victim impact statement confirmed that both she and

her daughter had received state-funded counseling but neither were fully

healed.  ROA.396.  "E.E." was four in 2020 when Etheridge raped her,

and as of July 2021, she had not made an outcry statement at counseling.

ROA.396.  Given "E.E.'s" young age, Ms. Trevino did not know whether

"E.E." remembered the assaults and did not know how they would affect

"E.E." in the future.  ROA.399.

At the sentencing hearing, Ms. Trevino informed the court that she

had not intended to speak.  ROA.308.  No doubt the facts of Etheridge's

recorded incestuous rapes of "E.E." were horrific.  *See Villalobos,* 879 F.3d

at 171-72.  Ms. Trevino again informed the court that her past expenses

for therapy for "E.E." were free, but that she feared future therapy

expenses for "E.E." once "E.E." remembered the assaults.  ROA.309, 311-

12.  The district court was entitled to credit this testimony at sentencing,

in addition to Ms. Trevino's written statement.  *See Reese,* 998 F.2d at

1282. Etheridge's argument that the court is limited to Ms. Trevino's written statement is incorrect. Appellant's Brief, 45-46. This Court affords the district court broad discretion at sentencing to consider affidavits and letters by the injured party and other hearsay evidence that bears minimal indicia of reliability so long as the defendant is given an opportunity to refute that evidence. *See Reese,* 998 F.2d at 1282.

Given that Ms. Trevino anticipated future therapy costs, but did not have past out-of-pocket expenses to use as a benchmark, the court used the $1,000 per year estimate provided by Etheridge's other victim, six-year-old "K.C." ROA.320. The court concluded that both "E.E." and "K.C." would "need similar care" even though the crimes against "E.E." involved incestuous rape, which was arguably more physically and emotionally harmful than the abuse suffered by "K.C." The court made a reasonable estimate given the significantly young age of "E.E."

The district court's approach was a reasonable and accepted method of calculating future medical expense loss in cases of sexual exploitation of very young children. *See Baker,* 672 F. Supp. 2d at 777 (due to the victims' disinterested and uncooperative custodial parent, the doctor's report was based on a one-time interview with the victims and recent

literature estimating the cost of future mental health treatment for sexual abuse and emotional abuse victims at $25,000 per victim).

On similar facts as here, the defendant in *United States v. Osman,* 853 F.3d 1184, 1185 (11th Cir. 2017), sexually abused his one-year-old daughter and recorded the abuse with his cell phone. He sent images to a co-defendant in exchange for receipt of sexually explicit images of the co-defendant's three-year-old daughter. *Id.* The Circuit understood that the minor's future therapy needs were "predictive because of "A.E.'s young age" and the facts of the offense:

> We are not dealing here with just the likelihood that a young child whose pornographic images are shared online will suffer residual effects from the reproduction of those images will need treatment. We are dealing with a child who was molested by her father, who will be informed of that fact, who will know that her father is absent from her life and suffering imprisonment based on that interaction. That is a heavy burden to place on a child. We cannot imagine that therapy will not be in order at the relevant times. Given the facts here, it seems that the need for future therapy is not just likely, but a virtual certainty.

*Id.* at 1192.

Etheridge suggests that because Ms. Trevino received state-assistance for "E.E.'s" past therapy, her request for funding for future treatment should be rejected. Appellant's Brief, 46. This argument fails

under the plain language of the statute. Under § 2259(b)(4)(B)(ii), a district court "may not decline to issue an order under this section because of the fact that a victim has, or is entitled to, receive compensation for his or her injuries from . . any other source." *See Kearney,* 672 F.3d at 99; *United States v. Crandon,* 173 F.3d 122, 126-27 (3d Cir. 1999). Where, as here, the record provides an adequate basis to support the restitution order, the district court did not need to make more specific findings and "E.E.'s" restitution award should be affirmed under plain-error review. *See Leal,* 933 F.3d at 431-32.

Should this Court disagree with the United States about the sufficiency of evidence to support restitution for "E.E.'s" loss, the proper remedy is to remand for resentencing for the district court to consider supplemental evidence of future therapy costs. *See Villalobos,* 879 F.3d at 172; *United States v. Jimenez,* 692 F. App'x 192, 204 (5th Cir. 2017) (unpublished).

In *Jimenez,* the defendant pleaded guilty to receipt of a visual depiction of a minor child engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a). 692 F. App'x at 194. Two days before sentencing, the probation officer filed an addendum to the PSR with a

letter from the victims' attorney requesting $25,000 for each of the five victims involved in the "8 Kids Series," a series of child pornography images that Jimenez had possessed. *Id.* at 195. The district court did not explain how the $25,000 loss per victim was determined. *Id.* This Court permitted the United States to present additional evidence of restitution for the victims on remand in order to prevent harm to them. *Id.* at 204.

It is undisputed that "E.E." has received past therapy for Etheridge's crimes and her mother anticipated "E.E.'s" need for future therapy because neither of them were "fully healed." ROA.309, 312, 396. Etheridge's request that this Court vacate and remand for an entry of zero restitution is unconscionable on the facts of this case. Nor is it supported by this Court's precedents for these types of heinous crimes against children. *See Villalobos,* 879 F.3d at 172; *Jimenez,* 692 F. App'x at 203. Should this Court determine that the district court's restitution award was erroneous, the appropriate remedy is to remand for supplementation of future therapy costs to avoid irreparable future harm to "E.E." *See Villalobos,* 879 F.3d at 172.

## <u>CONCLUSION</u>

This Court should affirm the judgment of the district court.

Respectfully submitted,

ALAMDAR S. HAMDANI
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

<u>s/ *Lauretta Drake Bahry*</u>
LAURETTA DRAKE BAHRY
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Phone: (713) 567-9102
Fax: (713) 718-3302

ATTORNEYS FOR APPELLEE

## **CERTIFICATE OF SERVICE**

I, Lauretta Drake Bahry, Assistant United States Attorney, hereby certify that on February 22, 2023, an electronic copy of the Appellee's Brief was served by notice of electronic filing via this court's CM/ECF system upon opposing counsel, Evan G. Howze.

Upon notification that the electronically filed brief has been accepted as sufficient, and upon the Clerk's request, seven paper copies of this brief will be placed in the United States Mail, postage prepaid, addressed to the Clerk. *See* 5th Cir. R. 25.2.1, 31.1; 5th Cir. ECF filing standard E(1).

s/ *Lauretta Drake Bahry*
LAURETTA DRAKE BAHRY
Assistant United States Attorney

## **CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,124 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2016 in Century Schoolbook font, 14 point font for text and 12 point font for footnotes.

3.    This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because this brief has been redacted of any personal data identifiers.

4.    This brief complies with the electronic submission of 5th Cir. R. 25.2.1, because this is brief is an exact copy of the paper document.

5.    This brief is free of viruses because this brief has been scanned for viruses with the most recent version of the McAffee Endpoint Security scanning program.

s/ *Lauretta Drake Bahry*
LAURETTA DRAKE BAHRY
Assistant United States Attorney
Date:  February 22, 2023