No. 22-40516


IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

REID ETHERIDGE,
Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Texas

————————————

**REPLY BRIEF FOR APPELLANT**

————————————


MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

EVAN G. HOWZE
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002
Telephone: (713) 718-4600

# TABLE OF CONTENTS

**Page**

Table of Citations......................................................................................iii

Statement of the Issues ............................................................................. 1

Argument..................................................................................................... 2

I. The district court's decision to impose a term of life imprisonment, as opposed to a lesser term of years, was influenced by a mistaken view of key sentencing evidence.................................................................2

    A. Mr. Etheridge arguably preserved this issue............................................5

    B. This claim of error is based on the district court's statements at sentencing, not speculation, and those statements reflect a mistaken view of the defense expert's risk evaluation............................................7

    C. The substantial "weight" the district court placed on the expert's conclusions makes this error actionable even on plain-error review ......11

II. Both restitution awards lack adequate evidentiary foundation, and no special circumstances excuse the government's failure to gather and produce any evidence of recoverable loss........................................................ 15

    A. The district court's restitution awards rest on *no* evidence and are thus plainly unlawful................................................................. 15

    B. The government's request for a do-over is foreclosed............................ 21

Conclusion ................................................................................................ 24

Certificate of Service ............................................................................... 25

Certificate of Compliance......................................................................... 26

# TABLE OF CITATIONS

**Page**

## CASES

*Paroline v. United States*, 572 U.S. 434 (2014) ........................................................ 17

*Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018) ....................................... 14

*United States v. Broussard*, 669 F.3d 537
  (5th Cir. 2012) ............................................................................... 7, 13

*United States v. Cabello*, 33 F.4th 281
  (5th Cir. 2022) ..................................................................................... 6

*United States v. Chem. & Metal Indus., Inc.*, 677 F.3d 750
  (5th Cir. 2012) .................................................................................... 21

*United States v. Corona-Gonzalez*, 628 F.3d 336
  (7th Cir. 2010) .................................................................................... 14

*United States v. Culbertson*, 712 F.3d 235
  (5th Cir. 2013) ............................................................................... 7, 13

*United States v. Danser*, 270 F.3d 451
  (7th Cir. 2001) ................................................................................ 18-19

*United States v. Escalante-Reyes*, 689 F.3d 415
  (5th Cir. 2012) (en banc) .................................................................. 13

*United States v. Futrell*, 209 F.3d 1286
  (11th Cir. 2000) ........................................................................... 15, 17

*United States v. Garcia-Quintanilla*, 574 F.3d 295
  (5th Cir. 2009) .................................................................................... 13

*United States v. Gonzalez-Castillo*, 562 F.3d 80
  (1st Cir. 2009) .................................................................................... 14

*United States v. Jimenez*, 692 F. App'x 192
  (5th Cir. 2017) .................................................................................... 23

# TABLE OF CITATIONS – (cont'd)

Page

## CASES – (cont'd)

*United States v. Olano*, 507 U.S. 725 (1993) .......................................... 11

*United States v. Sanchez*, 900 F.3d 678
  (5th Cir. 2018) ............................................................................. 7

*United States v. Sharma*, 703 F.3d 318
  (5th Cir. 2012) ............................................................................ 21

*United States v. Tobias*, 662 F.2d 381
  (5th Cir. Unit B Nov. 1981) ...................................................... 11

*United States v. Villalobos*, 879 F.3d 169
  (5th Cir. 2018) ....................................................................... 21-22

*United States v. Wilson*, 614 F.3d 219
  (6th Cir. 2010) ............................................................................ 14

*United States v. Wooley*, 740 F.3d 359
  (5th Cir. 2014) ............................................................................ 13

## STATUTES AND RULES

18 U.S.C. § 2251(e) ..................................................................... 4

18 U.S.C. § 3553(a) ................................................................ 11-12

18 U.S.C. § 3664(a) ................................................................ 16-17

18 U.S.C. § 3664(d)(1) ................................................................ 16

18 U.S.C. § 3664(d)(5) ............................................................ 16-18

# TABLE OF CITATIONS – (cont'd)

**Page**

## MISCELLANEOUS

Order Responding to Remand,
  *United States v. Villalobos*, NO. 2:16-cr-710
  (S.D. Tex. May 23, 2018) ........................................................................ 23

## STATEMENT OF THE ISSUES

*Issue one*. Did the district court rely on a mistaken view of sentencing evidence that played a critical role in its decision to select a life sentence, and does that error warrant remand for resentencing in view of a correct understanding of the evidence?

*Issue two*. Do the district court's respective $12,000 and $10,000 restitution awards lack sufficient evidentiary foundation such that they must be vacated?

# ARGUMENT

I. **The district court's decision to impose a term of life imprisonment, as opposed to a lesser term of years, was influenced by a mistaken view of key sentencing evidence**.

The facts of Mr. Etheridge's three offenses are horrific, as the government's graphic and drawn out recitation of those facts portrays. *See* Gov't Br. 3-11. Indeed, those gruesome details placed Mr. Etheridge in the rare category of offenders for whom the Sentencing Guidelines suggest a sentence of life imprisonment. But that is precisely why Mr. Etheridge's first claim of error is so serious.

Keenly aware of the nature of Mr. Etheridge's conduct, as well as the gravity of a lifetime prison term, the district court emphasized that the critical factor in its decision to go with a life sentence, rather than a three-decade-or-more term of years, was the extent to which Mr. Etheridge presented a risk of abusing other children if released—the life sentence "is a fair one here," the court reasoned, "largely because of [the] concern and fear that Mr. Etheridge is going to reoffend." ROA.318. As Mr. Etheridge detailed in his initial brief (at 12-15, 27-28), the court made clear that one piece of evidence, above all others, influenced its view that Mr. Etheridge posed an untenable risk of reoffending no matter how far into the future he might be released: the risk-assessment report prepared by the defense's expert, Stephen Thorne, Ph.D. The court repeatedly stressed that it understood Dr. Thorne's report to "say" that "Mr. Etheridge has an average chance of reoffending" upon release (ROA.276)—which

was to say that the court interpreted "the psychologist" as having concluded that "there is an average chance that" Mr. Etheridge's "deviant sexual behavior" was "going to reappear" and that he was "going to harm people in the future." ROA.290. And the court repeatedly underscored that it "put a lot of weight in" *that conclusion* "in deciding" how best to "protect future – potential future victims" from the risk Mr. Etheridge posed. ROA.288; *see* ROA.289 ("So again, I just put a lot of weight in what the psychologist says, and I'm just worried about that."). As noted, the court decided that a life sentence was the only way to adequately account for the degree of risk it interpreted the psychologist as having reported.

But, as Mr. Etheridge has shown, *see* Def. Br. 26-31, the district court's statements reveal that it misinterpreted both the degree and longevity of the risk Dr. Thorne in fact assessed. The doctor's report did not "say" that Mr. Etheridge "has an average *chance*" to reoffend. It said that Mr. Etheridge fell into the "average" category on a specific risk-assessment tool (the Static-99R). Def. Br. 7-8 (citing ROA.477-81). And it advised that the chances of a person in that category reoffending are extremely low according to the available empirical research, which both predicted that between 1.4% at the low end, and 6.7% at the high end, of "average" category offenders would recidivate (ROA.479-80), and showed that "the large majority of" average-category offenders "do not have documented arrests/convictions for new sex offenses" after their release. ROA.481 (Doctor Thorne's emphasis).

Nor did the doctor's report say, as the district court believed, that Mr. Etheridge would continue to present the same "chance of reoffending" of those in the "average" category irrespective of how long he remained imprisoned. To the contrary, the report placed Mr. Etheridge into the "average" category only "on the assumption that he could be released into the community prior to his 60th birthday." ROA.478. For that assumption to hold, the district court would have to sentence Mr. Etheridge, who was nearly 43 at the time of sentencing, to 20 years or less. But the lowest Guidelines range Mr. Etheridge faced, due only to a statutory maximum on two of his three counts, was 30 years, flat. Def. Br. 5 n.2; *see* 18 U.S.C. § 2251(e). Were he released after turning 60, the report made clear, the "average" categorization would have to be "revised." ROA.478. That is, the chances that Mr. Etheridge would recidivate would be *lower* still if, as was certain to be the case, he received a term that would keep him imprisoned into his 70s or beyond.

Because Dr. Thorne's "average" classification does not mean what the district court thought it meant, and because the corresponding recidivism risk would not apply upon Mr. Etheridge's release after any non-life term the court realistically would have imposed, Mr. Etheridge has urged this Court to vacate his sentence and remand for resentencing. *See* Def. Br. 26-32, 38. And that remedy is appropriate, he has explained, even if review is for plain error. *See id.* at 32-38.

4

The government resists in full. *See* Gov't Br. 38-44. It also takes umbrage at Mr. Etheridge's submission that there is at least a nonfrivolous possibility that his trial counsel's statements brought the gravamen of this error to the district court's attention. *Id.* at 34-38. Mr. Etheridge responds to the government's contentions below.

### A.    Mr. Etheridge arguably preserved this issue.

Contrary to the government's suggestion (Gov't Br. 34-35), Mr. Etheridge does not contend that his trial counsel's request for a lower sentence, alone, sufficed to preserve his more specific claims on appeal. Rather, he has suggested (Def. Br. 25-26) that his counsel's response to the district court's entreaty to opine on its understanding of the psychologist's report, read in conjunction with counsel's requests for a non-life sentence, could be viewed as having alerted the court to the gravamen of his appellate claim. Specifically, trial counsel responded by noting that the risk assessed in the report was "based on an assumption," and that the report also reflected that the "large majority of adult sex offenders do not reoffend sexually." ROA.290. And, for those and other reasons, counsel went on to contend that a "20- to 30-year sentence would be sufficient to address protection of the public" and "the victims." ROA.293. At a minimum, this rejoinder apprised the court that trial counsel believed the court's view of the degree of risk reflected in the report was incomplete.

Arguably, when viewed in context, counsel's response also suggested that the court had overlooked the same "assumption" Mr. Etheridge has shown on appeal that

the court failed to appreciate—namely, that the "average" risk categorization would apply to Mr. Etheridge only if he were released prior to age 60. That is Mr. Etheridge's submission on preservation. He acknowledges (*see* Def. Br. 25) that trial counsel neither described the pertinent "assumption," nor called attention to the court's conflation of Mr. Etheridge's placement in the "average" recidivism-risk *category* and an "average *chance*" of recidivating. So, it may be that Mr. Etheridge's submission is not the strongest; but that submission is not frivolous.

The government's suggestion (Gov't Br. 38) that trial counsel "waived" Mr. Etheridge's appellate claim, however, lacks merit. Waiver "is the intentional relinquishment or abandonment of a known right." *United States v. Cabello*, 33 F.4th 281, 295 (5th Cir. 2022). If trial counsel did indeed fail to adequately "suggest that [the report] says something otherwise" when the court invited her to do so, ROA.290, then that failure is a classic "forfeiture"—i.e., a "failure to make the timely assertion of the right" to have the court base Mr. Etheridge's sentence on an accurate understanding of the psychologist's conclusions. *Cabello*, 33 F.4th at 295. Counsel's answer in no way communicated to the court that Mr. Etheridge understood, but intended to relinquish, his right to be sentenced based on a correct view of the most pivotal sentencing evidence in the case.

In all events, preservation is not the main event here. Mr. Etheridge fully briefed these errors as if they went unpreserved. Def. Br. 32-38. Even under plain-error scrutiny, his claim that actionable sentencing error exists here has serious force.

> **B.      This claim of error is based on the district court's statements at sentencing, not speculation, and those statements reflect a mistaken view of the defense expert's risk evaluation.**

The government contends (Gov't Br. 38-39) that Mr. Etheridge rests this claim of error on "zero evidence," charging him with relying on "unsupported speculation." That dodge is not persuasive. Mr. Etheridge's claim rests not on speculation but on hard evidence—in the form of the district court's own statements at the hearing. This Court has recognized that "the district court's words are the best evidence of why it did what it did" in imposing a federal sentence. *United States v. Culbertson*, 712 F.3d 235, 243 (5th Cir. 2013). A "plain reading of the transcript" may sometimes reveal that the defendant's claim does not match "what the district court said it was doing." *United States v. Sanchez*, 900 F.3d 678, 684 (5th Cir. 2018). But "the transcript" can just as readily establish that the district court sentenced "based on" an improper consideration and "clearly indicate[] that the court's error affected [the defendant]'s substantial rights." *United States v. Broussard*, 669 F.3d 537, 555 (5th Cir. 2012); *see, e.g.*, *Culbertson*, 712 F.3d at 241-44 (finding district court's statements dispositive evidence of plain, reversible error).

As Mr. Etheridge has shown, *see* Def. Br. 27-31, the district court's words reveal that it misinterpreted the defense expert's report in a way that materially overstates Mr. Etheridge's assessed potential to reoffend, if ever released, in two independent ways. The government tellingly offers no alternative interpretation of what the district court's statements could have meant. Nor could it.

At the beginning of the hearing, the court professed its belief that Dr. Thorne's "report wasn't exactly favorable," and that his "conclusion was disturbing" *because* "he said Mr. Etheridge has an average *chance* of reoffending." ROA.276. The court then reiterated that belief twice, both in explicating its view of the primary "concern" bearing on the appropriateness of a life sentence, *see* ROA.289, and as a direct response to trial counsel's mitigating argument on that subject. *See* ROA.290. And context makes clear that, by "average chance," the court envisioned a much greater likelihood of recidivism than the at-most 6.7% chance the report reflects. The court stated that "[a]n average chance seem[ed] to [it] more than a slight chance," and labeled the difference between slight and average "significant" in "that it wasn't like" the apparently lower risk reflected in the "[co-defendant]'s report," which was "very different." ROA.276. The court later contrasted Dr. Thorne's notation that he could not "guarantee" Mr. Etheridge was "not going to do this again," by paraphrasing the doctor as "say[ing]," "'In fact, I'd say [Mr. Etheridge] has an average chance of reoffending.'" ROA.289. And, after noting that it interpreted the report as focusing in "large part" on

whether Mr. Etheridge "was somebody that is going to harm people in the future," the court paraphrased the doctor as "say[ing]," there "'is an average chance that that *will* happen.'" ROA.290. The import of these statements, in view of the context in which they were made, is that the court understood the doctor as opining that the "chances" of Mr. Etheridge reoffending were much more likely than the single-digit probability the report in fact reflects.

The government's only substantive response (Gov't Br. 39) is to take Mr. Etheridge to task for offering a colloquial analogy to the degree of risk implied by "average chance" in the way the court used that phrase: "50/50." *See* Def. Br. 29. Perhaps 50/50 is not precisely what the court meant. What matters is that, in common parlance, an "average chance" that something will happen is one that is relatively likely or not out of the ordinary. Neither of those things is true about the probability Dr. Thorne reported, which reflected a 93- to 98-percent chance that a person in Mr. Etheridge's "average" category would *not* reoffend. If someone were to say, "there's an average chance that it's going to rain tomorrow," no ordinary speaker of the English language would walk away thinking the prospect of rain the next day was in the single digits.

The government offers no response, moreover, to Mr. Etheridge's argument as to the district court's separate, more-important misimpression of the report. Even if the court was using "average chance" to refer to the one- to seven-percent chance Dr. Thorne reported, the court still mistakenly believed the report to suggest Mr. Etheridge

would present that "average chance" in perpetuity. *See* Def. Br. 29-31. Setting aside the court's view of the degree of risk reflected in the report, there is no disputing that the court viewed that risk as untenable and dispositive of its ultimate conclusion to embrace the life term recommended by the Guidelines. The court made clear that the "facts in this case are just so horrible" that its overriding "concern" was the need for a sentence that would "protect[] other children" from potential future harm. ROA.289. The court made clear that the "average chance of reoffending" it understood the report to assign to Mr. Etheridge was the key evidence influencing its view on that subject. ROA.290; *see* ROA.287-89 (detailing this). The court made clear that it viewed "incapacitation" as "the point" of, and "only reason for," a "life sentence." ROA.291. And, in pronouncing sentence, the court made clear that it felt "the [life] sentence is a fair one here largely because of [its] concern and fear that Mr. Etheridge is going to reoffend." ROA.318.

All of this puts beyond dispute that, at a minimum, the district court understood the doctor's report as concluding that Mr. Etheridge would present the degree of risk associated with an "average" classification *at release*. But the report made clear that Mr. Etheridge would *not* present the same degree of risk if released beyond age 60. And no one at Mr. Etheridge's sentencing hearing—himself included—was operating under the illusion that any non-life term the court would realistically entertain could see Mr. Etheridge released before his "60th birthday." ROA.478. Whether or not the

court appreciated the difference between the "average" categorization and the probability that a member of that category would reoffend, the court clearly did not appreciate that Dr. Thorne's assessment was premised on an assumption that was practically impossible to hold true at the time Mr. Etheridge would be released.

That misimpression alone suffices to establish that the court operated under an "erroneous and material" misunderstanding of key sentencing evidence. *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. Unit B Nov. 1981). And that "[d]eviation from a legal rule" is "'clear' or, equivalently, 'obvious,'" *United States v. Olano*, 507 U.S. 725, 732-33, 734 (1993), in light of the ample authority recognizing that a court's reliance on erroneous information in balancing the 18 U.S.C. § 3553(a) factors renders the resulting sentence both procedurally and substantively unreasonable. *See* Def. Br. 33-34 (collecting cases).

### C.    The substantial "weight" the district court placed on the expert's conclusions makes this error actionable even on plain-error review.

The government's contention (Gov't Br. 40-44) that this error is a poor candidate for correction under plain error's prejudice and discretion prongs is unpersuasive. The government first attempts (Gov't Br. 40-41) to divert the discussion to a single paragraph in Dr. Thorne's report in which the doctor lists several of the aggravating traits that factored into Mr. Etheridge's overall risk assessment. The government neglects to mention, however, that the doctor spends the next two paragraphs describing

11

all the "relevant mitigating factors." *See* ROA.480-81. Mr. Etheridge will not cata-

logue those factors here. The point is that the doctor did not, as the government sug-

gests, highlight a bunch of factors that independently "heightened [his] concern for

recidivism" such that the district court may have "credit[ed]" that "portion[] of the

report" while ignoring the rest. Gov't Br. 41. What the doctor in fact did was conclude

that Mr. Etheridge belonged in the "moderate" risk category on the "RSVP" assess-

ment tool, and in the "average" risk category on the Static-99R tool, based on the

balance of all the aggravating and mitigating factors, and on the assumption that Mr.

Etheridge would be released in "the near future." ROA.481. Indeed, the doctor em-

phasized that "the reader should note" that Mr. Etheridge's "overall profile" was "con-

sistent with what is often seen in offenders who are considered to be a 'low risk' for

future sexual recidivism," but that Mr. Etheridge's several aggravating traits neverthe-

less prompted the doctor to err on the side of the moderate and average designations.

ROA.481-82.

The government's remaining arguments also lack merit. The government high-

lights (Gov't Br. 42) the fact that the district court complied with its statutory obliga-

tion to consider other relevant Section 3553(a) factors, some of which were "distinct

from Dr. Thorne's report" and could have weighed in favor of "life imprisonment."

But this Court has routinely rejected the government's suggestions that dutiful con-

sideration of other legitimate sentencing factors may serve to cancel out the influence

of an erroneous or mistaken view of one or more factors. *E.g.*, *United States v. Wooley*, 740 F.3d 359, 369 (5th Cir. 2014); *Culbertson*, 712 F.3d at 242; *Broussard*, 669 F.3d at 555.

In *Broussard*, for example, this Court "d[id] not dispute that the district court considered other permissible factors in explaining its chosen sentence." 669 F.3d at 555. Yet the Court nevertheless concluded that the district court's "reliance on" an erroneous factor had "skewed the sentencing determination" and therefore "affected [the defendant]'s substantial rights" for purposes of plain error's third prong. *Ibid.* Here, as in *Broussard* and other cases finding reversible plain error where an erroneous view or factor influenced the sentence, the need to protect potential future victims "was 'such a central part of the district court's explanation of [Mr. Etheridge's] sentence that "[the Court] cannot confidently say that the district court would have imposed the same sentence" without it.'" *Culbertson*, 712 F.3d at 244 (quoting *United States v. Escalante-Reyes*, 689 F.3d 415, 425 (5th Cir. 2012) (en banc), in turn quoting *United States v. Garcia-Quintanilla*, 574 F.3d 295, 304 (5th Cir. 2009)).

The government also errs in suggesting (Gov't Br. 43) that the fact that other defendants have received life sentences for similar conduct in the past in some way ameliorates the force and effect of the due-process violation inherent in premising *Mr. Etheridge*'s life sentence on a mistaken view of the evidence as to *his* likelihood of recidivating. At least three of this Court's fellow courts of appeals have readily found

a court's reliance on an erroneous view of sentencing evidence to warrant an exercise of plain-error discretion. *See* Def. Br. 37-38 (citing *United States v. Gonzalez-Castillo*, 562 F.3d 80, 83 (1st Cir. 2009); *United States v. Wilson*, 614 F.3d 219, 225 (6th Cir. 2010); *United States v. Corona-Gonzalez*, 628 F.3d 336, 342-43 (7th Cir. 2010)). And those decisions reached that conclusion even before the Supreme Court clarified that sentencing errors that raise a reasonable probability of a lesser prison term are of a kind that ordinarily will warrant plain-error correction. *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907-08 (2018). The stakes in Mr. Etheridge's case—life; versus any lesser term—only amplify the extent to which correction is necessary to preserve the fairness, integrity, and public reputation of proceedings.

The district court took Mr. Etheridge's sentencing proceeding very seriously. But the court also labored under a misimpression that caused it to view *the* critical evidence as aggravating its concerns for public protection and deterrence when that evidence, properly construed, carried serious potential to mitigate those concerns. If there is plain error here, and Mr. Etheridge contends that there is, then due process— fundamental fairness—dictates that the case should go back so that the district court can perform the same careful analysis of this difficult case with a correct understanding of the evidence it valued most.

**II.    Both restitution awards lack adequate evidentiary foundation, and no special circumstances excuse the government's failure to gather and produce any evidence of recoverable loss.**

The government also resists (Gov't Br. 44-60) Mr. Etheridge's claim that the district court's restitution judgment rests on insufficient evidence. Here, too, its arguments are unpersuasive.

**A.    The district court's restitution awards rest on *no* evidence and are thus plainly unlawful.**

The government rightly notes (Gov't Br. 49) that Congress placed the burden squarely with it to "provide the [district] court with enough evidence to allow the court to estimate" the full amount of a victim's recoverable losses caused by the offense of conviction. It also correctly notes that district courts "may rely on the Government's reasonable approximation of loss and may accept estimates of loss when precision is not possible." Gov't Br. 49 (citing *United States v. Futrell*, 209 F.3d 1286, 1292 (11th Cir. 2000)). There is one glaring problem, however, with these recitations: *in this case*, the government proffered *no evidence* of loss as a template for estimation; and the record provides *no foundation* for the suggestion that "precision" on that score would have been difficult, much less impractical or impossible.

To start, the government omits the many statutory requirements that it plainly violated by failing to gather and produce any loss evidence before sentencing in this case. So Mr. Etheridge will fill that gap here. The presentence report contained no

accounting or estimation of offense-related expenses that K.C., E.E., or the minors'
respective families had incurred or expected to incur in the future. *Contra* 18 U.S.C.
§ 3664(a). Indeed, the report advised that no evidence of loss had been collected.
ROA.360, 369. Nothing in the record indicates that the probation officer encountered
circumstances that would make such an accounting "clearly impracticable," or that
the probation officer so informed the district court. *Contra* 18 U.S.C. § 3664(a).

There is likewise no indication in the record that, at some point after the report
was filed, the government otherwise complied with its obligation to provide the pro-
bation officer with a listing of any amounts subject to restitution at least 60 days prior
to sentencing. *Contra id.* § 3664(d)(1). Nor is there any indication that the prosecutor
or probation officer ever concluded that any past or anticipated losses would not be
ascertainable by ten days prior to sentencing, and so informed the court.[1] *Contra id.* §
3664(d)(5). Indeed, going into sentencing, the only restitution-related "evidence" that
had been provided to Mr. Etheridge—or the court—was that E.E.'s mother had de-
clared, in a sworn affidavit attached to a later-filed addendum to the presentence re-
port, that she incurred "no" counseling expenses, a "minimal" amount of undescribed
medical expenses, and an unreported amount of undescribed lost income. ROA.379-
82.

---

[1] Sentencing occurred in July of 2022—more than a year after the final presentence report was
filed in June of 2021; and three months shy of two years from the time the offenses came to light in
October of 2020. ROA.271, 351.

In short, every indication in the record is that the government simply had no evidence of loss to produce. The most logical way to make sense of that void is that the government reached out to the victims and learned that there was no concrete evidence to be had, perhaps because the State had provided free counseling, as Ms. Trevino's affidavit advises was the case for E.E., or because the victim did not respond, as with the fact that K.C.'s father chose not to return a loss affidavit as requested.[2]

For the first time on appeal, the government now suggests that its failure to gather and produce competent loss evidence, which prompted the district court to step in and "speculat[e]" to fill the void (ROA.303), could be explained by a lack of "resources," Gov't Br. 51, or practical difficulties in finding and tabulating that evidence. *Id.* at 49 (citing *Futrell*, 209 F.3d at 1292). But the government waived any such claim by failing to bring any difficulties or impracticalities to the district court's attention— not only prior to sentencing, as required by statute, *see* 18 U.S.C. § 3664(a), (d)(5), but even at sentencing. And everything we know from the record demonstrates that the kind of losses at issue here, if they existed, were eminently provable.

Medical expenses are easy to calculate; they produce doctor bills. The government offered no evidence and elicited no testimony about past medical expenses, or

---

[2] Some context is relevant here: K.C.'s father, Mr. Cronkhite, is the spouse of the co-defendant, Ms. Cronkhite—who was present for, participated in, and in some instances carried out the abuse that K.C. suffered. *See* Def. Br. 3. Thus, any restitution flowing from that abuse was chargeable to both K.C.'s mother and Mr. Etheridge, to the extent that their respective acts of abuse proximately caused any recoverable losses. *Paroline v. United States*, 572 U.S. 434, 448 (2014).

from which to estimate future expenses. Mr. Cronkhite, K.C.'s father, and the co-defendant's spouse, cited none in his victim allocution. ROA.296-306. And Ms. Trevino, E.E.'s mother, cited none in her affidavit and confirmed as much in her allocution. ROA.307-12, 379-82.

The number and cost of counseling sessions is just as easy to identify and calculate. As to K.C., the government offered no evidence and elicited no testimony on either of those easily deducible amounts. In his allocution, Mr. Cronkhite could only guess—reluctantly, and after admitting he "honestly [was] not sure"—as to the amount he had paid for K.C.'s then-discontinued counseling. ROA.304-05. As to E.E., Ms. Trevino made clear in both her affidavit and in her allocution that E.E.'s then-discontinued counseling had been paid for by the State—i.e., that she did not have any counseling-related actual loss. ROA.309, 311, 380.

The government likewise offered no evidence, and elicited no testimony, from which to reasonably estimate future therapy costs as to either victim. Like past therapy expenses, the likely cost of future therapy is not difficult to support with evidence that would allow for reasonable estimation. Indeed, the case the government cites as an example on this point, *United States v. Danser*, 270 F.3d 451 (7th Cir. 2001), illustrates the qualitative difference between a total failure to offer any evidentiary template for estimation, as is the case here, and the government's understandable failure to proffer perfect evidence of all future therapy needs, as occurred in *Danser*. As the government

notes, in *Danser*, at sentencing, "the [victim] child's *therapist testified* that she would require long-term mental health care, possibly for the rest of her life." Gov't Br. 54 (citing *Danser*, 270 F.3d at 452). And "*the prosecution provided* a[n] [estimated] restitution amount" for therapy, the bulk of which "comprised future therapy costs." Gov't Br. 54 (citing *Danser*, 270 F.3d at 452).

The dispositive difference between that case and this one is apparent. No one, much less a therapist, *testified* at Mr. Etheridge's sentencing hearing. *The prosecution* proffered *no* approximation of restitution at *any point* in the proceedings. And neither parent laid a reliable evidentiary foundation from which to make a reasonable estimate of future therapy expenses in their unsworn allocution statements.[3]

The government simply asserts (Gov't Br. 54) that the district court "reasonably estimated future therapy expenses" for K.C. despite the fact that it offered (and now points to) no concrete evidence to support Mr. Cronkhite's on-the-spot estimation that he had paid approximately $2,000 for the discontinued therapy and could anticipate similar expenses for the next several years. *See* ROA.305-06. Indeed, Mr. Cronkhite also stated that he "honestly [was] not sure" about "the cost" of K.C.'s prior therapy

---

[3] The government repeatedly characterizes (Gov't Br. 31-32, 52, 55-56) the parents' allocution statements as "testimony." That is factually inaccurate. The district court made clear that the parents' statements represented "victim allocution," that the parents were "not under oath," and that "nobody g[ot] to ask [them] questions, although, [it] may have some." ROA.296. The court also noted that, "[i]f there is some kind of *testimony* [the parents] want[ed] to provide, then, [it] c[ould] swear [them] in." ROA.296. Neither parent was sworn in at any point. And the government expressly declined to ask any questions of each parent. ROA.306, 312.

sessions, ROA.304, that he "prefer[red] not to" guess on that subject, ROA.304, and that he had "watched very carefully for ['emotional damage']" but ha[d]n't seen anything" as yet. ROA.302. And, in responding to the court's question whether he "ha[d] discussed" with K.C.'s "current psychologist" the possibility that she might need additional future therapy, Mr. Cronkhite made clear that he "ha[d] not, no." ROA.303. Those equivocal unsworn statements did not provide a suitably reliable evidentiary foundation from which to extrapolate a reasonable estimate of the need for and cost of future therapy for K.C.

The government's assertion (Gov't Br. 57) that it was "reasonable" for the court to estimate the same amount of future expenses for E.E. in the absence of any prior accounting or evidentiary foundation is similarly misplaced. Ms. Trevino answered, "None for now" in the field for "future counseling sessions anticipated" in her sworn affidavit. ROA.380. At the hearing, Ms. Trevino confirmed that E.E.'s then-discontinued therapy "was all free"—she "didn't pay for anything." ROA.309. And, as to future expenses, she said only, "but my fear is that there may be expenses in the future, and I'm hoping that's not the case but I just don't know." ROA.309-10.

The government cannot now, on appeal, claim that practical considerations prevented it from performing its statutory duty to marshal and produce evidence of restitution, especially when the prosecutor expressly declined the court's invitation to ask questions of each parent following their respective allocutions. *See* ROA.306, 312.

"[E]very dollar" comprising a restitution award "must be supported by record evidence"—even if that evidence no more than affords the district court a jumping-off point to reasonably estimate past or future expenses. *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012). That did not happen here. The district court plainly erred in awarding $12,000 in restitution to K.C. and $10,000 to E.E. in the absence of any competent evidence of actual or anticipated losses.

### B.   The government's request for a do-over is foreclosed.

The government contends that its failure to gather and produce evidence of loss sustained by these two victims is excusable by special circumstances, Gov't Br. 49-51, and it accordingly asks this Court to order open remand to allow the government to "supplement[]" the record with proof. *Id.* at 59-60. As Mr. Etheridge has explained, Fifth Circuit precedent forecloses that request. *See* Def. Br. 39-40, 48-49 (citing, e.g., *United States v. Chem. & Metal Indus., Inc.*, 677 F.3d 750 (5th Cir. 2012)).

The government's contrary argument is premised on *United States v. Villalobos*, 879 F.3d 169 (5th Cir. 2018). *See* Gov't Br. 49-51. *Villalobos* "vacate[d]" a restitution award where, as here, the government made no attempt to proffer evidence of restitution and the district court speculated as to the existence of potential losses. *See* 879 F.3d at 171-72. According to the government, the *Villalobos* panel "sided with the United States and agreed that upon remand, the victims could provide supplementation to support" any losses. Gov't Br. 50. This was so, says the government, because

the *Villalobos* panel agreed that it had shown the "special circumstances" needed to overcome the general rule that evidentiary failures in the restitution context are final. Gov't Br. 50-51. By the government's telling, *Villalobos* "held that 'special circumstances' existed" to trigger the exception, Gov't Br. 51 (citing *Villalobos*, 879 F.3d at 172); and, on remand, it accordingly got to present evidence of loss for the first time. *Ibid.*; *see id.* at 60 (citing *Villalobos* as support for requesting that remedy).

Neither the government's description of *Villalobos*'s holding, nor of the result on remand, is accurate. In fact, this Court declined to resolve the question of special circumstances, directing the "district court to ask and decide whether special circumstances excuse[d] the government's failure to present evidence the first time around." *Villalobos*, 879 F.3d at 172. The Court did so because of a peculiar fact: the victim's mother had—unlike the parents here—been "unable to speak" at sentencing because she was overcome by emotion. *Id.* at 171. Still, the Court found the "mother's inability to speak" to present a unique situation that made it "prudent" to enlist *the district court* to assess whether special circumstances excused the government's failure in the first instance. *Id.* at 172. And, contrary to the government's suggestion, the district court, on remand, rejected the government's argument that special circumstances existed so as to excuse its prior failure to provide evidence of loss: "After remand to this court to consider reopening the issue of restitution for the victim, the court at a hearing heard from the attorneys for the parties and reviewed the sentencing record. The court rules

that the Government should not be allowed to reopen." Order Responding to Remand, *United States v. Villalobos*, No. 2:16-cr-710 (S.D. Tex. May 23, 2018) (Head, J.).

Here, just as there, the government has offered no plausible basis to conclude that it was prevented—even by its own negligence, *cf. United States v. Jimenez*, 692 F. App'x 192, 203 (5th Cir. 2017)—from discharging its duty to marshal competent evidence of past or anticipated future losses on behalf of these victims. And since this case does not involve the unique situation that made it prudent to leave that question to the district court in *Villalobos*, the ordinary prohibition on do-overs applies. The appropriate remedy is to vacate the unsupported restitution awards and enter judgment of no restitution.

## CONCLUSION

The Court should vacate Mr. Etheridge's prison sentence and remand for resentencing. The Court should also vacate the district court's restitution awards and either render judgment of no restitution or remand with instructions to confine any further proceedings on that subject to the present state of the record.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

s/ *Evan G. Howze*
EVAN G. HOWZE
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002
Telephone: (713) 718-4600

## CERTIFICATE OF SERVICE

I certify that this reply brief was served upon counsel for appellee by notice of electronic filing with the Fifth Circuit CM/ECF system.

s/ *Evan G. Howze*
EVAN G. HOWZE

## CERTIFICATE OF COMPLIANCE

1.  This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,660 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.  This reply brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6), as it has been prepared with the current version of Microsoft Word software, Microsoft Office 365 edition, using the proportionally spaced, Times New Roman typeface in the text (14-point) and footnotes (12-point).

3.  This reply brief was filed electronically, in native Portable Document File (PDF) format, via the Fifth Circuit's CM/ECF system.

4.  This reply brief complies with the privacy-redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

5.  This reply brief complies with the electronic-submission requirement of 5th Cir. R. 25.2.1 because it is an exact copy of the paper document.

6.  This reply brief has been scanned for viruses with the most recent version of a commercial antivirus scanning program and is free of viruses.

s/ *Evan G. Howze*
EVAN G. HOWZE